[Nos. 28909, 28908. Department Two. January 29, 1943.]

THE STATE OF WASHINGTON, on the Relation of Edward Bolling et al., Plaintiff, v. THE SUPERIOR COURT FOR CLALLAM COUNTY, Ralph Smythe, Judge, Respondent.

THE STATE OF WASHINGTON, on the Relation of Clifford P. Fuller, et al., Plaintiff, v. RALPH SMYTHE, as Judge of the Superior Court for Clallam County, Respondent.[1]

[1] Reported in 133 P. (2d) 803.

*A. E. Dailey,* for relators.

*Max Church,* for respondents.

BEALS, J.—The above entitled matters, which are original proceedings filed in this court, are before us in form as follows: In cause No. 28909, the petitioners, Edward Bolling and wife, ask for a writ of certiorari to review an order of the superior court for Clallam county, entered in a matter pending before the juvenile department, declaring three minor children of the petitioners, all under the age of sixteen years, to be dependent children, making the children wards of the court, and placing them, as delinquent children, in the custody of Mrs. Hazel Tarr, subject to further order.

Proceeding No. 28908 comprises the applications of Mr. and Mrs. Clifford P. Fuller, Mr. and Mrs. William Grittman, and Mr. and Mrs. Walter Parr, for a writ of prohibition to prevent the superior court from depriving petitioners of the custody of their respective children, who are also minors, and from entering orders declaring the children to be dependent children, and for that reason making the children wards of the court, taking them from their respective parents and awarding custody of the children to some person or persons other than petitioners, their natural parents.

Alternative writs having been issued, full returns were filed, and, as the proceedings all involve the same question, one set of briefs only was filed, and the matters were argued and submitted together for final disposition.

The single question presented involves the right of respondent, sitting as juvenile judge, to take minor children of school age from their parents and award the children to the custody of others, because the children have been expelled from the common schools of

this state by reason of their refusal, while in attendance at school, to salute the flag of the United States of America, pursuant to Rem. Rev. Stat., § 4777 [P. C. § 4980], which reads as follows:

"Every board of directors of the several school districts of this state shall procure a United States flag, which shall be replaced with a new one whenever the same become tattered, torn or faded, and shall cause said flag to be displayed upon or near each public school building during school hours, except in unsuitable weather, and at such other times as to said board may seem proper, and shall cause appropriate flag exercises to be held in every school at least once in each week at which exercises the pupils shall recite the following salute to the flag: 'I pledge allegiance to my flag and to the republic for which it stands. One nation indivisible with liberty and justice for all.'"

The above section is § 4, chapter 90, Laws of 1919, that act consisting of amendments to the school code.

The school authorities having insisted upon compliance with the section of the statute above quoted, the minor children of the petitioners in these proceedings, upon conscientious grounds, refused to repeat the pledge of allegiance contained in the statute, stating that, according to their religious belief, the repetition of words constituting the pledge, together with accompanying gestures, are acts which are against their religious convictions. The children, having refused to comply with the law and the directions of the school authorities, were expelled, and, being unable to attend any other school, were brought before the juvenile court as delinquent children. After a hearing in the matter of the welfare of the Bolling children, the trial court entered an order declaring that the parents had "neglected and refused to provide or permit proper training and education" for the children, declared the children wards of the court, and placed them, until

further order of the court, with Mrs. Hazel Tarr, their elder sister. The court filed a comprehensive memorandum opinion, containing findings of fact.

In the other above entitled proceeding before this court, the records show that minor children of the three sets of parents who are petitioners herein also refused to repeat the flag salute, the court announcing that orders similar to that entered in the matter of the Bolling children would be entered in each case. Prior to the entry of any such order, the parents applied to this court for a writ of prohibition forbidding such action, and, in the alternative writ which this court entered, further proceedings on the part of the superior court were stayed, pending decision by this court of the questions presented. The trial court has stated that, in the matters of 'the Fuller, Parr, and Grittman children, situations are presented identical with that appearing in the Bolling case.

The proceedings having been argued together, and the questions presented being in all respects identical, the cases will be disposed of in one opinion. The record presents no disputed question of fact, and no matter requiring the exercise of judicial discretion is involved.

The minor children of the parties to these proceedings were expelled from school because of their refusal to participate in the weekly exercises held in the school pursuant to § 4777, the children refusing to repeat the words constituting the pledge of allegiance to the flag, as contained in the section, upon the ground that repeating the words of this pledge and making the appropriate gestures were against their religious belief, as violating the second commandment as contained in the book of Exodus, chapter 20, verses 4 and 5. It appears that the repetition of the words of the pledge was accompanied by a gesture of the right

arm, which the children were taught by their parents constituted an act of reverence to a graven image, or an idol, and was consequently forbidden by the second commandment.

The parents of the children and the children are members of a religious group, or cult, calling themselves "Jehovah's Witnesses." This religious cult has existed in this country and in other countries for many years; its doctrines and teachings are well known and almost fanatically observed by its adherents. The children in question have been brought up in the belief that the teachings of the leaders of the group correctly expound the laws of God, as contained in the Bible. That the belief both of the parents and the children in these teachings is sincere, cannot be doubted.

It is not suggested that either the parents or the children are in any way immoral, or that any of them have violated any laws, rules, or regulations, other than as above stated.

It also appears that, after the expulsion of the children from the common school, no other means of pursuing their education were available to them.

Petitioners rely upon the first amendment to the constitution of the United States, ratified December 15, 1791, commonly referred to as article one of the bill of rights, which, as adopted, was a limitation upon the power of Congress, and which reads as follows:

"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

By the fourteenth amendment, this section was made applicable to the states. 12 C. J. 941; 16 C. J. S. 600, Constitutional Law, § 206.

Petitioners also rely upon the constitution of the state of Washington, amendment four, approved November, 1904, which reads in part as follows:

"Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or be disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state."

Petitioners argue that the requirement that their children repeat the words of the pledge to the flag, as contained in § 4777, *supra,* accompanying the words with a physical salute to the flag, the gesture and the repetition of the words being against their religious belief, violates their constitutional rights, as secured to them by the first amendment to the Federal constitution and the portion of the amendment to our state constitution above quoted. In this connection, it may be noted that Congress, by joint resolution, chapter 435, Second Session, Public Law 623, Seventy-seventh Congress (H. J. Res. 303), entitled

"Joint Resolution to codify and emphasize existing rules and customs pertaining to the display and use of the flag of the United States of America,"

duly resolved, *inter alia,*

"Sec. 7. That the pledge of allegiance to the flag, 'I pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with liberty and justice for all', is rendered by standing with the right hand over the heart; extending the right hand, palm upward, toward the flag at the words 'to the flag' and holding this position until the end, when the hand drops to the side. However, civilians will always show full respect to the flag when the pledge is given by merely standing at attention, men removing the headdress. Persons in

uniform shall render the military salute." (36 U. S. C. A. (Sup.), § 172.)

The joint resolution of the Congress does not require any person to repeat the pledge of allegiance, though it does provide that civilians will show respect to the flag when the pledge is given, by "standing at attention, men removing the headdress."

In this connection, it should be noted that petitioners state that they and their children honor and respect the flag, and that it accords with their religious views to stand at attention while others repeat the pledge of allegiance. The trial court did not find, nor is it even suggested, that petitioners or their children at any time, or place, or in any manner have manifested any disrespect to the flag, or treated it otherwise than with respect.

The trial court in its ruling followed the opinion of the supreme court of the United States, in the case of *Minersville School Dist. v. Gobitis,* 310 U. S. 586, 84 L. Ed. 1375, 60 S. Ct. 1010, decided June 3, 1940, in which the supreme court speaking through Mr. Justice Frankfurter, upheld a regulation of a local board of education of Pennsylvania, which required both teachers and pupils to participate in a salute to the national flag as part of a daily school exercise. The Gobitis children, Lillian, aged twelve, and William, aged ten, were expelled from the public schools of the district for refusing to participate in the salute to the flag, the children and their parents being affiliated with Jehovah's Witnesses, and the children refusing to participate in the flag salute as against their religious belief. The court, by a majority of eight to one, reversed a decree of the circuit court of appeals for the third circuit, enjoining the school district from continuing to enforce an order expelling the Gobitis children from

the public schools, and from requiring them to participate in the salute to the flag, as a condition to their right to attend school.

Mr. Justice (now Chief Justice) Stone dissented, stating that in his opinion the decree of the circuit court should be affirmed. We shall refer to his dissent later.

In the recent case of *Jones v. Opelika*, 316 U. S. 584, 86 L. Ed. 1691, 62 S. Ct. 1231, decided June 8, 1942, the supreme court held valid certain municipal ordinances exacting reasonable and nondiscriminatory license fees from persons engaged in the sale of religious books and pamphlets through the ordinary methods used in commercial canvassing. In our opinion, the case is not particularly in point here, as the court distinguished the *Gobitis* case, finding no occasion to directly apply the principles therein laid down. Mr. Chief Justice Stone again dissented, as did Mr. Justice Murphy, Mr. Justice Black, and Mr. Justice Douglas, the three last named justices deeming it an appropriate occasion to state that in their opinion the *Gobitis* case, in which they concurred, had been wrongly decided.

In the recent case of *Barnette v. West Virginia State Board of Education*, 47 F. Supp. 251, Judge Parker, circuit judge, and district judges Watkins and Moore, presiding over the district court for the southern district of West Virginia, in a suit brought by three persons belonging to the sect known as Jehovah's Witnesses, enjoined the state board of education from enforcing a regulation of the board requiring children in the public schools to salute the national flag. Apparently the questions presented were exactly similar to those in the *Gobitis* case, and the court was careful to state at some length its reasons for not following that decision.

In the case of *State v. Smith,* 155 Kan. 588, 127 P. (2d) 518, the supreme court of Kansas held that a regulation requiring school children to participate in the flag salute could not be enforced against persons who declared that the salute as required was against their conscientious convictions, the court holding that, as to such persons, the regulation was in violation of the state bill of rights guaranteeing freedom of worship and speech.

In the case of *People ex rel. Fish v. Sandstrom,* 279 N. Y. 523, 18 N. E. (2d) 840, the court reversed the conviction of the parents of a child who had refused to participate in the flag salute, the parents having been convicted of the offense of keeping the child from school. The child was not expelled from school, nor was she kept from school by her parents. The court held that upon the record the parents had committed no offense, and that, if the student had been insubordinate or disobedient, she was the person who should have been dealt with, under the provisions of the education law. The majority expressed the view that the law requiring the flag salute should be enforced, but that question was not decided.

The constitutional guarantees of freedom of religious belief and of speech are of vital importance to the maintenance of our system of government. The majority of any political unit, or even a large minority, can generally protect themselves, but the courts are the sole reliance of individuals who assert that their constitutional rights in these particulars have been infringed. In proper cases, the courts may consider the sincerity or lack of sincerity with which such a claim as that of petitioners is advanced; and in the case at bar there can be no question but that petitioners and their children are sincere in their belief that the repetition of the statutory salute to the flag,

together with the usual accompanying gestures, constitute a violation of their religious principles. It is, for the vast majority of us, hard to understand how people can entertain this belief, but that is entirely beside the question. Petitioners and their children do in all sincerity believe that very thing.

Of course, many people pay lip service to our national ensign, who have in their hearts no reverence for the flag or for the principles for which it stands, and an enforced gesture or word of respect is of no benefit to anyone. Acts of disrespect or insult must be punished, but we are not here concerned with any such question.

We have many laws which were enacted for the benefit of persons whose religious beliefs cause them to have scruples concerning many acts which the great majority of our citizens perform freely and willingly. Persons who have scruples in the matter of taking an oath may testify upon affirmation; the Federal constitution, Art. II, § 1, accords to the president-elect the privilege of affirming the obligation which he must take before entering on the execution of his office, and Art. I, § 7, excepts Sundays from the computation of the ten day period within which the president shall return to Congress a bill which has been delivered to him for action. Even in providing for such a vital matter as national defense, Congress has made some provision for the benefit of those who have conscientious scruples against engaging in armed combat. (Selective service and training act of 1940, 50 U. S. C. A. (Sup. Appendix), § 305 (g).)

It is difficult to refrain from quoting at length from Chief Justice Stone's dissent in the *Gobitis* case, as the basic principles which we deem controlling in the case at bar are therein so clearly and forcefully stated. In the course of this dissent, the writer said:

"History teaches us that there have been but few infringements of personal liberty by the state which have not been justified, as they are here, in the name of righteousness and the public good, and few which have not been directed, as they are now, at politically helpless minorities."

Continuing, attention is called to the fact that the constitution nowhere indicates that compulsory expressions of loyalty form any such part in our government as to override the constitutional protection of freedom of speech and of religion, and that, while expressions of loyalty to our government, when voluntarily given, may promote national unity, it is quite another matter to say that a particular, compulsory expression of loyalty by children, in violation of their own and their parents' religious convictions, can accomplish any good purpose. The dissent continues:

"The very terms of the Bill of Rights preclude, it seems to me, any reconciliation of such compulsions with the constitutional guaranties by a legislative declaration that they are more important to the public welfare than the Bill of Rights.

"But even if this view be rejected and it is considered that there is some scope for the determination by legislatures whether the citizen shall be compelled to give public expression of such sentiments contrary to his religion, I am not persuaded that we should refrain from passing upon the legislative judgment 'as long as the remedial channels of the democratic process remain open and unobstructed.' This seems to me no less than the surrender of the constitutional protection of the liberty of small minorities to the popular will. We have previously pointed to the importance of a searching judicial inquiry into the legislative judgment in situations where prejudice against discrete and insular minorities may tend to curtail the operation of those political processes ordinarily to be relied on to protect minorities. See *United States v. Carolene Products Co.,* 304 U. S. 144, 152, note 4. And until now we have not hesitated similarly to scrutinize

legislation restricting the civil liberty of racial and religious minorities although no political process was affected. *Meyer v. Nebraska,* 262 U. S. 390; *Pierce v. Society of Sisters,* [268 U. S. 510]; *Farrington v. Tokushige,* 273 U. S. 284. Here we have such a small minority entertaining in good faith a religious belief, which is such a departure from the usual course of human conduct, that most persons are disposed to regard it with little toleration or concern. In such circumstances careful scrutiny of legislative efforts to secure conformity of belief and opinion by a compulsory affirmation of the desired belief, is especially needful if civil rights are to receive any protection. Tested by this standard, I am not prepared to say that the right of this small and helpless minority, including children having a strong religious conviction, whether they understand its nature or not, to refrain from an expression obnoxious to their religion, is to be overborne by the interest of the state in maintaining discipline in the schools."

In the *Barnette* case,. Judge Parker calls attention to the fact that it is for the courts to decide

" . . . whether the public welfare is jeopardized by acts done or omitted because of religious belief; but they have nothing to do with determining the reasonableness of the belief. That is necessarily a matter of individual conscience."

After observing that the religious liberty guaranteed by the constitution has nothing to do with the question of whether or not the belief of an individual is reasonable or otherwise, so long as the individual's acts or refusal to act are not directly harmful to the public, the opinion continues:

"This does not mean, of course, that what a man may do or refrain from doing in the name of religious liberty is without limitations. He must render to Caesar the things that are Caesar's as well as to God the things that are God's. He may not refuse to bear arms or pay taxes because of religious scruples, nor may he engage in polygamy or any other practice di-

rectly hurtful to the safety, morals, health or general welfare of the community. See cases cited in *Minersville School District v. Gobitis*, 3 Cir. 108 F. (2d) 683, 689. To justify the overriding of religious scruples, however, there must be a clear justification therefor in the necessities of national or community life."

With the foregoing statement we are in entire agreement.

For reasons stated in the opinion, the United States district court, in deciding the *Barnette* case, did not feel obligated to follow the opinion of the supreme court in the *Gobitis* case. Under all the circumstances, that opinion can scarcely be deemed to have become authoritative. In any event, it is for this court to construe and apply the portion of our state constitution above quoted.

One of the cornerstones of our system of government is religious toleration, which is established by our fundamental law. We therefore enjoy freedom of thought and of belief, *as guaranteed by law*. A practical toleration may exist under a government whose laws proscribe certain beliefs, as such, or require religious conformity, and provide for the punishment of nonconformity. If such laws are not enforced, religious toleration may result, the toleration of indifference, but without any assured legal basis. It is also true that religious intolerance may exist and manifest itself unpleasantly in countries whose laws guarantee entire religious freedom.

It is one of the most important duties of our courts to ever guard and maintain our constitutional guarantees of religious liberty, and to see to it that these guarantees are not narrowed or restricted because of some supposed emergent situation, or because it may be considered that the enforcement of some law or regulation circumscribing religious liberty would be

of little consequence as possibly affecting only a few persons, or because the consequences of the impingement upon the constitutional guarantees may appear insignificant.

Many examples of the importance of a mere gesture may be found in history. In the time of the Roman empire, it was customary for the people to burn a pinch of incense before a statue of the emperor. The early Christians, while recognizing the sovereignty of the emperor, refused to perform this ceremony, deeming it idolatrous. Pliny the Younger, a lawyer of distinction, acting as governor of a Roman province in Asia Minor, had occasion to write to his friend, the Emperor Trajan, describing his difficulties in ferreting out and punishing Christians, as such, residing within his jurisdiction. He refers to the fact that an order to offer incense before the statue of the emperor was one test applied to ascertain whether or not a particular individual was a Christian. A refusal to perform the rite was equivalent to an affirmation that the one refusing was a Christian, and subject to the severe penalties of the Roman law. A phrase, or the making of a gesture, which to most people may seem either right or possibly unimportant, may to others appear to be of great significance.

Too often in times past persons in authority, who were sincerely convinced that they knew and believed the truth, have felt themselves justified in persecuting persons holding different opinions, believing that the truth should avail itself of all means at its disposal, including the strength of the secular arm, in order to enforce belief, or at least conformity.

It is not necessary to enter upon any discussion of the manifold difficulties which would follow the taking of well behaved children from good moral homes, and bringing them up as wards of the state, either in

state institutions or with families other than their own. The complications which would follow from such a course would be serious, but we decide the questions here presented upon constitutional guarantees only.

It is most unlikely that it ever occurred to any member of the legislature who voted to make § 4777 a law, that any man, woman, or child ever would object to obeying that law upon religious grounds, but it has transpired that such is the case. Petitioners and their children claim and are entitled to the protection of our constitutional guarantees of religious liberty.

Our decision in this case must not be considered as authority for tolerating the least disrespect for the flag which is the symbol of our liberty. Respect for our flag as a symbol of our country is part of our way of life, and disrespect to the flag constitutes an offense against our laws. The children of petitioners, by standing respectfully at attention during the exercises comprising the salute to the flag, will show due respect to the national standard during the ceremony, and the fact that, because of their conscientious scruples, they are excused from doing that which the law provides shall be done, and which others cheerfully do, should impress not only those who claim the privilege of following their religious convictions, but all others, with the fact that the flag protects each citizen, and that the government of which it is the symbol guarantees to all religious liberty.

The section of the code above quoted, which requires school children to repeat the form of words constituting the salute to the flag, as set forth in the law, may not be enforced as against the children of the petitioners in these proceedings.

The order of the superior court which is before us for review in proceeding No. 28909 is reversed, and in proceeding No. 28908, a writ of prohibition will issue,

388

directing the superior court to refrain from entering any similar order in the cases pending before the superior court, to which the petitioners and their children are parties.

SIMPSON, C. J., BLAKE, and ROBINSON, JJ., concur.

[1]Reported in 133 P. (2d) 811.