[No. 31857.  *En Banc.*  January 10, 1952.]

THE STATE OF WASHINGTON, *on the Relation of Maurice S. Holcomb, as Guardian ad Litem, Appellant,* v. GRANT ARMSTRONG *et al., Respondents.*[1]

[1]Reported in 239 P. (2d) 545.

*George H. Boldt* and *King & King,* for relator.

*The Attorney General* and *John Spiller, Special Assistant,* for respondents.

*Ballinger, Hutson & Eberharter, amici curiae.*

OLSON, J.—The trial court denied an application for a writ of mandamus made on behalf of Dayis Holcomb, whom we will refer to as the appellant. She sought to compel the respondent board of regents to permit her to register as a student at the University of Washington. She was not permitted to register because she refused to comply with the requirement of respondents that, before registration, all students have an X-ray examination of the chest for the purpose of discovering possible tubercular infection.

Since 1941, the respondent board has required all entering freshmen to have this examination as a condition precedent to registration. The appellant entered the university in 1947 as a freshman and, after voicing her objections, submitted to the examination.

In 1950, upon the advice of the health officer of the university, the respondent board extended this requirement to all students desiring to register. When she applied for registration for her senior year, appellant would not comply with this rule. She is a member of the Christian Science church and adheres to its doctrine. She requested exemption from the examination because of her belief that submission to it is contrary to that doctrine and to her personal religious convictions.

The health officer of the university testified to certain facts regarding the nature of tuberculosis, its incidence on the university campus, and the reasons for making the requirement in question. His testimony was uncontroverted and, in summary, was that tuberculosis is an insidious, slow, and progressive disease and is infectious; that a per-

son may be infected with it and show no symptoms of the disease nor be aware of his infection; that its early discovery is difficult, except by an X ray of the chest; that this method of exploration is generally considered best adapted to mass screening by the medical profession; that a tubercular lesion in the lungs will show as a shadow upon an X-ray film; and that further tests will then permit a positive diagnosis.

An exhibit prepared by the health officer gave the incidence of tuberculosis at the university since 1941:

| YEAR | "ACTIVE CASES Students Entrance Exams | Clinic | Total | ARRESTED CASES Students Entrance Exams | Clinic | Total | Grand Total |
|---|---|---|---|---|---|---|---|
| 1940-41 | 19 | | 19 | 14 | | 14 | 33 |
| 1941-42 | 3 | 8 | 11 | 3 | 12 | 15 | 26 |
| 1942-43 | 6 | 4 | 10 | 19 | | 19 | 29 |
| 1943-44 | 13 | | 13 | 19 | | 19 | 32 |
| 1944-45 | 10 | | 10 | 40 | | 40 | 50 |
| 1945-46 | 16 | 2 | 18 | 56 | | 56 | 74 |
| 1946-47 | 9 | 5 | 14 | 12 | | 12 | 26 |
| 1947-48 | 11 | 12 | 23 | 12 | | 12 | 35 |
| 1948-49 | 8 | 8 | 16 | 15 | | 15 | 31 |
| 1949-50 | 3 | 7 | 10 | 33 | | 33 | 43 |
| 1950-51 | 9 | | 9 | 33 | | 33 | 42" |

The health officer further testified that the cases of active tuberculosis found occasionally among upper classmen by the university health department, in the clinic, were discovered quite accidentally; that cases discovered originally through X ray, in employees and students, averaged approximately fifty each year; that early discovery prevents the disease from reaching the infectious stage unrecognized and uncontrolled; that in one year eight new cases were traced to one infectious case.

He stated it to be his conclusion that, in order to protect the health of the student body, it is imperative that every effort be made to discover the presence of the disease on the campus, and that for this purpose the requirement of an X-ray examination of all registering students is necessary.

Whether compliance with the questioned regulation is contrary to the doctrine to which appellant adheres is not in controversy, nor is her sincerity.

It is not the proposal of the respondents that any person found to be infected take any prescribed treatment. The regulation is purely for the purpose of discovery. It does not say to this appellant, you must be treated if you are ill; it only says, if you are so unfortunate as to be ill and not know it, you cannot spread your infection to others at the university. Its primary concern is not for the possibly infected student, but is for those jeopardized by contact with such an individual. It is a preventive measure. Noncompliance with it for any reason by one or more of the group tends to make such a measure ineffective.

Appellant's assignments of error raise two questions: the constitutionality of the regulation, and the power of the respondent board to make it.

The material portion of the first amendment to the constitution of the United States is:

"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; . . ."

■■ This right is protected against infringement by state action. *Cantwell v. Connecticut,* 310 U. S. 296, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A. L. R. 1352 (1940); *State ex rel. Bolling v. Superior Court,* 16 Wn. (2d) 373, 133 P. (2d) 803 (1943). Here the action of the regents is the action of the state.

■ There is no presumption in favor of the constitutionality of any regulation involving civil rights. *Schneider v. State of New Jersey,* 308 U. S. 147, 84 L. Ed. 155, 60 S. Ct. 146 (1939).

Amendment 4 to the constitution of the state of Washington provides, in part:

"Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or be disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so con-

strued as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state. . . . "

■ Religious freedom embraces two concepts:

"Freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut, supra,* p. 303.

■ This freedom can be restricted "only to prevent grave and immediate danger to interests which the State may lawfully protect." *West Virginia State Board of Education v. Barnette,* 319 U. S. 624, 639, 87 L. Ed. 1628, 63 S. Ct. 1178, 147 A. L. R. 674 (1943). In the *Bolling* case, *supra,* this court expressed a similar view. Other restatements of the "clear-and-present-danger" test have been made in numerous cases since Justice Holmes gave it life in 1919 in *Schenck v. United States,* 249 U. S. 47, 63 L. Ed. 470, 39 S. Ct. 247. Their citation or review would not be helpful. The test must be applied to the facts of each case because, as its author said, "It is a question of proximity and degree."

■ With these principles in mind, we cannot say the questioned regulation violates any constitutional inhibition. Here the public interest threatened is the health of all of the students and employees of the university. It may lawfully be protected. In this case, it is of more importance than the right of appellant which is infringed. The danger to this interest is clear and present, grave and immediate. Infringement of appellant's rights is a necessary consequence of a practical attempt to avoid the danger. The questioned requirement utilizes the generally approved method of combating the danger, and no practical method which might not possibly infringe a constitutional right is shown. It is a regulation pertaining to the second aspect of the constitutional inhibition, mentioned in the *Cantwell* case, *supra,* in which aspect the conduct of appellant is subject to regulation for the protection of others. Her "freedom to believe" remains absolute.

Appellant's second question places in issue the power of the board of regents to make this regulation. The authority

of the board arises from Rem. Rev. Stat., § 4554 [P.P.C. § 911-7], and Rem. Rev. Stat. (Sup.), § 4557 [P.P.C. § 911-11]. In the former, the government of the university is vested in the board of regents. The latter provides, in part:

"... First. The said board shall have full control of the university ..."

There is no express power granted to the regents to pass a regulation regarding the health of the students. Failing an express grant, the regents may only exercise those powers necessarily or fairly implied in or incident to the powers expressly granted or those essential to the declared objects and purposes of the university—not simply convenient but indispensable. *Juntila v. Everett School Dist. No. 24*, 178 Wash. 637, 35 P. (2d) 78 (1934), and cases cited.

The trial court found that the questioned regulation was necessary to implement a regulation of the state board of health requiring all employees of the university, including faculty members, to submit to periodic chest examinations. The board of health has not required that students be examined, although, as counsel concede, it might have power to do so. In the absence of this action by the state board of health, the board of regents acted. It is not shown that the power conferred upon the state board of health is exclusive in this field or that its action may not be supplemented. The regents may have been prompted to pass the questioned requirement because of the nonaction of the board of health. The fact that the regents acted does not establish their power to act, but the facts indicate the necessity for their action, if the health program adopted by the board of health is to be completely protective on the campus.

The protection and improvement of the health and physical condition of the students is as much the responsibility of the regents as is their mental training and development. They cannot neglect the former and expect the latter to flourish. It is their duty to provide for both. The institution which they govern cannot continue to function effectively if either is not well supervised. If it cannot be said

that the physical improvement of a student is an obligation of the respondents, it surely can be said that every reasonable precaution should be taken by them to see that a student's health is not injured. If any reasonable precautionary measure will keep him at least as free of infection as he was when he came to the institution, its enactment should be well within the proper boundaries of the responsibilities of the respondents. Authority to foster and protect, if not to improve, both the physical and mental status of the students is essential to the declared objects and purposes of the university. The regulation in question is an exercise by the respondents of the power to guard, by a method approved by medical science and practice, that which they should and must protect.

█ Because power to make and enforce reasonable health regulations affecting all students is indispensable to the continued operation of the institution, it must have been the legislative intent that such power be implied in the general grant of "full control of the university." The close contact among the students and between the students and the faculty in the classroom and in other places of assembly on the campus, the wide diversity of places from which the students come, and their various conditions of physical health and development, must have been in the mind of the legislature when the government of the university was lodged in the board of regents. Authority has been given to them to charge to and collect from each of the students registering such hospital or health fees as they may establish. Rem. Rev. Stat., § 4546 [P.P.C. § 911-35], as last amended by Rem. Supp. 1947, § 4546. At least, it must have been intended that they would not permit an infectious disease to spread on the campus, if a way to prevent its doing so became known to them. Mere contemplation of an institution where action necessary for that purpose cannot be taken by its governing board, when no other public authority has acted, answers any doubt upon the subject.

We therefore conclude that the board of regents had the power to make and enforce the regulation in question, and

that the disallowance of the exemption claimed by appellant was proper.

The judgment is affirmed.

SCHWELLENBACH, C. J., MALLERY, HILL, GRADY, DONWORTH, and WEAVER, JJ., concur.

HAMLEY, J. (dissenting)—Attendance at the University of Washington is not compulsory. I am therefore inclined to believe that the board of regents was not exercising the police power of the state in promulgating the regulation in question. It was simply the exercise of administrative power such as is vested in all public officers with respect to the use and occupancy of public property and the performance of official duties. If this be true, then the constitutional guarantees respecting the free exercise of religion are not directly involved. They are drawn into issue only where there is an element of compulsion. *Hamilton v. Regents of University of California*, 293 U. S. 245, 79 L. Ed. 343, 55 S. Ct. 197; *West Virginia State Board of Education v. Barnette,* 319 U. S. 624, 631, 87 L. Ed. 1628, 63 S. Ct. 1178.

Under this analysis there would still remain the question of whether the failure to except appellant from the requirement of an X-ray examination because of her religious beliefs was arbitrary and capricious. Where the acts of public officers are arbitrary or capricious, the courts may interfere to protect the rights of individuals. *Moore v. Spokane*, 88 Wash. 203, 152 Pac. 999; *State ex rel. Yeargin v. Maschke*, 90 Wash. 249, 155 Pac. 1064; *State ex rel. York v. Board of County Commissioners*, 28 Wn. (2d) 891, 184 P. (2d) 577, 172 A. L. R. 1001.

The trial court found that the failure to make this exception was not arbitrary or capricious. My examination of the record leads me to a contrary conclusion. However, since the majority does not decide the case on this basis, no useful purpose will be served by an amplification of my views on this point.

If, as the majority holds, the regulation in question is amenable to the constitutional guarantees referred to, then

I fully agree that Justice Holmes' "clear-and-present-danger" test is applicable. This means that the regulation is not to be sustained in so far as it interferes with appellant's free exercise of her religion, unless such interference is necessary in order to meet a clear and present danger. The burden is upon respondent to establish such necessity. And, as the majority points out, there is no presumption in favor of the constitutionality of any regulation involving civil rights.

It may be noted, at the outset, that the trial court made no findings of fact or conclusions of law, express or implied, to the effect that it was necessary to subject appellant to the X-ray requirement in order to meet a clear and present danger. The finding that failure to make this exception was not arbitrary or capricious is clearly not tantamount to a finding of clear and present danger. As the United States supreme court said, in *Thomas v. Collins*, 323 U. S. 516, 530, 89 L. Ed. 430, 65 S. Ct. 315:

"The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation."

Findings of fact and conclusions of law are required in mandamus proceedings. *State ex rel. Howland v. Olympia Veneer Co.*, 131 Wash. 209, 229 Pac. 529. Hence it seems plain to me that the findings of fact and conclusions of law do not support the judgment denying the application. The judgment should accordingly be reversed for this reason alone.

But the majority undertakes to supply this necessary conclusion. It is held, in effect, that there exists a clear and present danger which requires interference with appellant's free exercise of religion by requiring her to submit to the X-ray examination.

The majority properly points to the distinction between "freedom to believe" and "freedom to act." Yet we must not lose sight of the fact that it is the free *exercise* of religion which is protected by the first amendment. There is

rarely any need of court intervention to protect freedom to believe, since there are not many ways in which a state, even if it would, could impair that freedom. The freedom which has been vindicated in all the great supreme court decisions concerning the Bill of Rights is freedom to act. Appellant apparently has the idea, which should not be considered quaint, that religion is not something which need only be thought about between the hours of eleven and noon on Sunday morning, but must be expressed in daily living. Her right to do so should be safeguarded if not clearly inimical to the general public interest.

The majority also calls attention to the fact that the X-ray regulation does not prescribe medical treatment, but is purely for the purpose of discovery. I take it, however, that it was not intended, by this reference, to undermine the facts, established in the record without contradiction, that medical examinations are contrary to Christian Science doctrine, and that a Christian Scientist is hindered in the practice of his religion when compelled to submit to such examination. It is, of course, immaterial that such doctrine is incomprehensible to many people, including the writer. The reasonableness of a religious belief is not subject to challenge here. *State ex rel. Bolling v. Superior Court*, 16 Wn. (2d) 373, 384, 133 P. (2d) 803.

What, then, is a "clear and present danger"? *First*, it must be a danger of some "extremely serious" substantive evil. *Bridges v. California*, 314 U. S. 252, 263, 86 L. Ed. 192, 62 S. Ct. 190. *Second*, the danger must be "clear," that is, there must be proof that the evil will almost inevitably result from the particular exercise of freedom. *Whitney v. California*, 274 U. S. 357, 376, 71 L. Ed. 1095, 47 S. Ct. 641; Antieau, "Clear and Present Danger—Its Meaning and Significance," 25 Notre Dame Lawyer 603, 604. *Third*, the danger must be "present," that is, the "degree of imminence extremely high" (*Bridges v. California, supra*, p. 263), or "immediate and urgent" (*Board of Education v. Barnette, supra*, p. 633); it "must not be remote or even probable; it

must immediately imperil" (*Craig v. Harney,* 331 U. S. 367, 376, 91 L. Ed. 1546, 67 S. Ct. 1249).

The quoted expressions concerning the "clear-and-present danger" rule set an extremely strict test. And yet they are by no means to be regarded as setting the maximum standards for determining constitutionality. Quite to the contrary, as the United States supreme court said in a decision involving freedom of speech:

"Those cases do not purport to mark the furthermost constitutional boundaries of protected expression, nor do we here. They do no more than recognize a minimum compulsion of the Bill of Rights." (*Bridges v. California, supra,* p. 263.)

It may be readily granted that the thing sought to be guarded against—infection with tuberculosis—is an extremely serious substantive evil. But is there a clear and present danger, as defined above, that this evil will result if appellant and those who are like situated are exempted from the X-ray examination in question? Will other students at the university "almost inevitably" contract tuberculosis if appellant and others sharing her religious beliefs are not screened before the X-ray machine once a year? Will such danger "immediately" (as distinguished from remotely or even probably) imperil other students?

In my opinion, there is no fact or consideration stated in the majority opinion which would justify an affirmative answer to these questions. The only fact which might seem to warrant such a conclusion is contained in the statement that in one year eight new cases were traced to one infectious case. The record reveals, however, that this infectious case was not a student, but a surgical supervisor employed by King county hospital. At the oral argument we were told that this person came into contact with, and apparently contracted, tuberculosis at Firlands sanitorium and thereafter transmitted it to students in her class at the university. Needless to say, this incident in no wise establishes that failure to X-ray appellant will immediately and almost inevitably imperil other students.

There are some other facts contained in the record but not stated in the majority opinion which also ought to be considered. While tuberculosis is infectious, it is only moderately so. It is not, for example, as infectious as measles. Tuberculosis has declined progressively for the past fifty years, so that it is now a relatively minor cause of death. In 1900 the death rate from tuberculosis was three hundred per year per one hundred thousand population. In 1940 this had dropped to forty per year per one hundred thousand. In 1950, when the regulation complained of was imposed, the death rate was eighteen per year per one hundred thousand. The causes of this improvement are many, some having to do with lessened incidence of tuberculosis and others having to do with improved methods of treatment. Mass X-raying became practicable about 1940 and no doubt has had considerable to do with the improvement achieved since then.

The eleven-year tabulation set out in the majority opinion, taken in conjunction with the known increase in student population, indicates that there has been a declining percentage of active cases among the students, as compared to campus population. The record does not indicate how many students are now on the campus. Assuming, however, that there has been an average of fourteen thousand students at the university the past two years, the tabulation referred to shows that there has been one active case of tuberculosis for each 1,473 students in 1949-1951.

The record does not indicate how many students share appellant's religious beliefs and would seek exemption from the X-ray examination if this were permitted. Let us assume, however, that there are two hundred such students. It follows that if the present relation between number of students and active cases continues, annual X-ray examinations of all two hundred would result in the discovery of one active case of tuberculosis every seven and one-third years. In view of this slight prospect of discovering new cases, how can it possibly be said that, if these Christian Science students are relieved from the X-ray examinations,

the remaining students will be almost inevitably and immediately placed in danger of contracting tuberculosis?

The health officer of the university testified that it is his opinion that the requirement of an X-ray examination of all registering students is necessary. In so far as the X-ray program as a whole is concerned, his opinion is well supported by the facts of record. In so far as his opinion may be taken to discountenance any exceptions on religious grounds or otherwise, I find no support for it in the evidence.

It was the health officer's view that a single case of tuberculosis is an "epidemic," if it can be prevented. This interesting conception of the term "epidemic" doubtless evidences an admirable frame of mind in one charged with supervising the health of university students. But this court cannot consider itself bound by such an extreme view when confronted with the task of adjusting a conflict between the exercise of police power and the enjoyment of guaranteed liberties.

I am of the opinion that the majority here, as did the trial court below, gave undue weight to the opinion expressed by the university health officer, allowing it to outbalance all other considerations. Acknowledging our own lack of qualifications to express an opinion in the field of *materia medica,* we must nevertheless place in proper perspective the opinions of those who are so qualified. As Justice Jackson said, in *Board of Education v. Barnette, supra,* which overruled *Minersville School Dist. v. Gobitis,* 310 U. S. 586, 84 L. Ed. 1375, 60 S. Ct. 1010, 127 A. L. R. 1493, and held invalid an attempt by West Virginia to compel students to give the flag salute contrary to their religious beliefs:

"Nor does our duty to apply the Bill of Rights to assertions of official authority depend upon our possession of marked competence in the field where the invasion of rights occurs. True, the task of translating the majestic generalities of the Bill of Rights, conceived as part of the pattern of liberal government in the eighteenth century, into concrete restraints on officials dealing with the problems of

the twentieth century, is one to disturb self-confidence. These principles grew in soil which also produced a philosophy that the individual was the center of society, that his liberty was attainable through mere absence of governmental restraints, and that government should be entrusted with few controls and only the mildest supervision over men's affairs. We must transplant these rights to a soil in which the *laissez-faire* concept or principle of non-interference has withered at least as to economic affairs, and social advancements are increasingly sought through closer integration of society and through expanded and strengthened governmental controls. These changed conditions often deprive precedents of reliability and cast us more than we would choose upon our own judgment. But we act in these matters not by authority of our competence but by force of our commissions. We cannot, because of modest estimates of our competence in such specialties as public education, withhold the judgment that history authenticates as the function of this Court when liberty is infringed." pp. 639-640.

Those of us who attended the university prior to 1941, when the X-ray program was first set up, did not then consider that we were facing a clear and present danger of contracting tuberculosis. We were certainly not so advised by health authorities. How can it be, that in 1950 and 1951, with the incidence of tuberculosis dwindling and most of the campus population regularly taking the X-ray examinations, there has come into being a clear and present danger that the students will be infected by the tiny fraction who seek exemption on religious grounds?

Those who here find sufficient justification for the frustration of appellant's deep religious convictions doubtless feel that her injury will be slight and short-lived. But the issue before us encompasses far more than the rights of one individual. It is in such ways as this, if at all, that our basic liberties will be lost. As a people we will rise quickly to defend our freedom from brazen dictators, foreign or domestic. Can we, however, withstand the insidious erosion produced by a multiplicity of little instances where, as here, a guaranteed right is set aside because it interferes with what is said to be good for us?

It seems to me that the precedent established by the majority strikes down one more pillar supporting the fundamental liberties of a freedom-loving society—a pillar which other citizens holding different beliefs, may some day sorely need to withstand a different encroachment upon the free exercise of their own religion.

FINLEY, J. (dissenting) — Very few cases involving claimed violations of constitutional religious liberties or rights can be examined with the mathematical exactness accorded the present appeal by the dissenting opinion. The coldly impersonal, unemotional, mathematical calculation there suggested, reducing the problem evil or menace to student health to a mathematical formula or relationship, is quite persuasive. Using (1) the University of Washington health officers' statistics respecting the incidence of tuberculosis in the student population of the university for approximately a decade; and (2) an assumed figure or number representing students who might claim exemption from X-ray examination because of their adherence to the Christian Science religion (and the assumed figure appears reasonable to me, certainly in the absence of more definite information in the record); thereupon, the alleged evil or menace to student health appears to fall short of the "clear-and-present-danger" standard. As stated in the dissent, if the present incidence of tuberculosis continues on the campus, X-ray examinations of all of the assumed number of students who are Christian Scientists might uncover one active case of tuberculosis every seven and one-third years. For the foregoing and other reasons discussed by Judge Hamley, I concur in his dissenting opinion.

---

February 27, 1952. Petition for rehearing denied.