[No. 32370. *En Banc.* December 2, 1954.]

ARTHUR A. KAUL, *Appellant,* v. THE CITY OF CHEHALIS *et al.,*
*Respondents.*[1]

[1]Reported in 277 P. (2d) 352.

*Karr, Tuttle & Campbell, Robert K. Keller,* and *James B. Carroll,* for appellant.

*Lee J. Campbell,* for respondents.

WEAVER, J.—Appellant challenges the validity of ordinance No. 653-A adopted June 25, 1951, by the city commissioners of the city of Chehalis. The ordinance provides:

"That a source of fluoridation approved by the State Department of Health be added to the water supply of the City of Chehalis under the rules and regulations of the Washington State Board of Health, such addition to be administered in a manner approved by the State Director of Public Health."

Appeal is taken from a judgment dismissing appellant's suit to enjoin the respondent city from fluoridating the city water supply pursuant to the above ordinance. Appellant does not question the findings of fact entered by the trial court. The facts found, therefore, become "the established facts in the case." Rule on Appeal 43, 34A Wn. (2d) 47, as amended, effective January 2, 1953.

In his memorandum opinion, the trial judge said:

"The questions to be determined by this court are purely legal and constitutional questions, and will be dealt with only from that standpoint. It is of no consequence or impor-

tance whether I personally approve or disapprove of fluoridation."

With this we agree. Our discussion of the case will likewise be limited.

Appellant is a taxpayer and a registered voter. He has lived in Chehalis for fourteen years. For the past eight years, he has lived in a rented house which is connected to the municipal water system. He has paid for the use of all water billed to him.

Acting in its proprietary capacity (*Russell v. Grandview*, 39 Wn. (2d) 551, 553, 236 P. (2d) 1061 (1951)), the city owns and operates a municipal water system, originating eighteen miles southeast of the city. It furnishes water to the residents of Chehalis and to nonresidents living along the supply line.

If the water is fluoridated, it will be necessary for appellant and all other users "to use it for domestic purposes including drinking, because there is no other practical source of supply."

The trial court found:

"VI. That although fluoride is a deadly poison used commercially for the extermination of rats and other vermin, the addition to the municipal water supply of Chehalis of a source of fluoride ion, such as sodium silico fluoride, in the proportion of one part per million *will not amount to a contamination and the water will continue to be wholesome.* That chlorine is added to water to affect either bacteria or plant life in the water, while fluoride has no effect upon the water or upon the plant life in the water but remains free in the water and is artificially added solely for the effect it has on the individual drinking the water. (Italics ours.)

"VII. That dental caries, commonly referred to as tooth decay, is a very common disease of mankind. That tooth decay is neither infectious or contagious. That the addition of fluoride to the Chehalis water supply is intended solely for use in prevention of tooth decay primarily in children up to 14 years of age, and particularly between the ages of 6 and 14 and will prevent some tooth decay in some children."

The trial court entered judgment dismissing the action

with prejudice. Seven assignments of error are directed to the conclusions of law; one is directed to entry of judgment.

Did the city council exceed its authority when it adopted ordinance No. 653-A providing for fluoridation of the water?

Article XI, § 11, of the state constitution provides:

"POLICE AND SANITARY REGULATIONS. Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws."

The trial court found that Chehalis is "operating under the Commission Form of Government pursuant to RCW Chapter 35.17." Therefore, Chehalis is governed by the statutes applicable to cities of the second class. Rem. Rev. Stat., §§ 9093, 9100 [cf. RCW 35.17.030].

Laws of 1907, chapter 241, § 29, p. 634 (Rem. Rev. Stat., § 9034 [cf. RCW 35.23.440]) provides:

"The city council of such city shall have power and authority: . . .
"(24) *Water Supply:* To adopt, enter into and carry out means for securing a supply of water for the use of such city or its inhabitants, . . .
"(27) *Health Board:* To establish a board of health; *to prevent the introduction and spread of disease;* . . .
"(56) To provide for the general welfare." (Italics ours in text.)

(Note that the statute authorizes the city "to prevent the introduction and spread of disease" as contrasted to the charter powers of the city of Shreveport "to prevent the introduction and spread of *contagious* diseases." We will refer to this later when discussing *Chapman v. Shreveport* (1954), No. 116282, First District Court, Caddo Parish, Louisiana.)

Laws of 1909, chapter 249, §§ 290, 291, p. 979 (Rem. Rev. Stat., § 2542 [cf. RCW 70.54.010]) (Rem. Rev. Stat., § 2543 [cf. RCW 70.54.020]) and Laws of 1899, chapter 70, p. 114 (Rem. Rev. Stat., §§ 9473, 9475, 9476, 9477 [cf. RCW 35.88-.010-020, RCW 35.88.050-070]) contain numerous provisions, both penal and otherwise, designed to insure the purity of water supplies.

█ Dental caries is neither infectious nor contagious. This, however, does not detract from the fact that it is a common disease of mankind. As such, its prevention and extermination come within the police power of the state. In *State v. Boren,* 36 Wn. (2d) 522, 525, 219 P. (2d) 566 (1950), this court said:

"The state, under its police power, has the right, and it is its duty, to protect its people in their health and general welfare. The very existence of government, as well as the security of the social order, depends upon this right. This is especially true as to the health of the people, which affects every man, woman, and child within the state."

Laws of 1901, chapter 116, § 1, p. 236 [*cf.* Rem. Rev. Stat., § 6001; RCW 43.20.050], gives the Washington state board of health broad powers and duties for the "preservation of the life and health of the people of the state." By regulation of the state board of health,

"No water shall be provided or rendered available for use to the public for drinking or domestic use which is of unsatisfactory sanitary quality and is not approved by the State Department of Health." Part 2, Book V, Rules and Regulations of the State Board of Health, § 7.

We note that the same regulation (§ 7, subsection 4.21) provides that:

"The presence of . . . fluoride in excess of 1.5 p.p.m. [parts per million] . . . shall constitute grounds for rejection of the supply."

January 25, 1950, the state board of health adopted section 19 of the rules identified *supra.* It was in force when the ordinance in question was passed. It provides:

"Sec. 19. Fluoridation of Public Water Supplies. An owner [which by definition includes a city] may participate in a program of fluoridation (the regulated application of a fluoride as sodium fluoride) of the public water supply, providing the procedures are followed as outlined herein: . . ."

(This rule was amended July 25, 1952, but its purpose was not changed.)

■■ We find nothing in the ordinance which is in conflict "with general laws" or which detracts from the constitutional and statutory grants to the city to make and enforce local police, sanitary, and other regulations. Nor do we agree that the fluoridation is *ultra vires* simply because the police power is exercised through a municipal agency operated by the city in its proprietary capacity.

■ Since the city acted in the exercise of its police power for the protection of public health to "prevent the introduction and spread of [this] disease" among its citizens, the subject matter of this exercise of power, and its expediency, are beyond judicial control, except as they may violate some constitutional right guaranteed to appellant. *Dowell v. Tulsa,* 273 P. (2d) (Okla.) 859 (1954) (fluoridation of water).

We fail to see, however, where any right of appellant, guaranteed by the constitution, has been invaded. The instant situation is vastly different from one where appellant is required to take affirmative action and is subject to punishment for failure to act. The ordinance under consideration does not compel him to do anything; it subjects him to no penalty. Liberty implies absence of arbitrary restraint. It does not necessarily imply immunity from reasonable regulations imposed in the interest of the community.

In some sections of the country, fluoride appears as a natural element in water. When it appears naturally in proportions not deleterious to health, would it be contended that the city could be forced to remove it?

The trial court's finding is unchallenged that:

". . . The addition to the municipal water supply of Chehalis of a source of fluoride ion, such as sodium silico fluoride, in the proportion of one part per million *will not amount to a contamination and the water will continue to be wholesome.*" (Italics ours.)

■■ It is the duty of the city to furnish appellant with wholesome water, free from contamination. The court found that the city will continue to furnish wholesome water. This fulfills the city's obligation to appellant and violates none of his constitutional rights.

This conclusion finds support in *DeAryan v. Butler*, 119 Cal. App. (2d) 674, 260 P. (2d) 98 (1953), *Dowell v. Tulsa*, 273 P. (2d) (Okla.) 859 (1954), and *Kraus v. Cleveland*, 116 N. E. (2d) 779 (1953), affirmed 121 N. E. (2d) 311 (1954).

Subsequent to the cited opinion of the *DeAryan* case, *supra*, it became final when the supreme court of California denied a petition for a hearing. June 7, 1954, the United States supreme court denied certiorari. 347 U. S. 1012, 74 S. Ct. 863. The California appellate court, in holding constitutional an ordinance providing for the fluoridation of a public water supply, said:

"The United States Supreme Court, in establishing and clarifying the constitutional right of religious and other freedoms, has distinguished between the direct compulsions imposed upon individuals, with penalties for violations, and those which are indirect or reasonably incidental to a furnished service or facility. (*Hamilton v. Regents of The University of Calif.*, 293 U. S. 245 [55 S. Ct. 197, 79 L. Ed. 343]; *West Virginia State Board of Education v. Barnette*, 319 U. S. 624 [63 S. Ct. 1178, 87 L. Ed. 1628, 147 A. L. R. 674]; *Cantwell v. State of Connecticut*, 310 U. S. 296, 303 [60 S. Ct. 900, 84 L. Ed. 1213, 128 A. L. R. 1352].)"

The supreme court of Oklahoma, in holding constitutional an ordinance for the fluoridation of water, said:

"We think the weight of well-reasoned modern precedent sustains the right of municipalities to adopt such reasonable and undiscriminating measures to improve their water supplies as are necessary to protect and improve the public health, even though no epidemic is imminent and no contagious disease or virus is directly involved. [Citing authorities.] Where such necessity is established, the Courts, especially in recent years, have adopted a liberal view of the health measures promulgated and sought to be enforced." *Dowell v. Tulsa*, 273 P. (2d) (Okla.) 859 (1954).

It would extend this opinion unduly to analyze in detail each of the cases cited by appellant. It is sufficient to point out that they fall into two categories, neither one of which changes the opinion already expressed.

The first contains those cases where the courts have held it a valid exercise of the police power, for the protection of public health, to prevent the introduction or spread of *con-*

*tagious* or *communicable* diseases. *Jacobson v. Massachusetts*, 197 U. S. 11, 49 L. Ed. 643, 25 S. Ct. 358, 3 Ann. Cas. 765 (1904) (compulsory adult vaccination with penalty for refusal) and *Blue v. Beach*, 155 Ind. 121, 56 N. E. 89, 50 L. R. A. 64, 80 Am. St. 195 (compulsory vaccination of children as a condition to entering or remaining in public school) are illustrative of appellant's first category of authorities. In the main, the cases are based upon the theory of "the pressure of great danger." From the cases of this type, appellant argues, that since the instant case involves a *noncontagious* disease, which does not present a grave and immediate danger to the public, an extension of the police power to the situation results in an invasion of his constitutional rights.

■ This conclusion depends upon a refinement we are unwilling to make. Protection of public health includes protection from the introduction or spread of both contagious and noncontagious diseases. There is a direct and significant relationship between dental health and general bodily health of individuals. We find nothing in this jurisdiction which limits the police power, exercised in the realm of public health, solely to the control of contagious diseases, as distinguished from noncontagious diseases. Further, under the police power, a health regulation may be an effective public measure, without the existence of some immediate public necessity.

*State ex rel. Bolling v. Superior Court*, 16 Wn. (2d) 373, 133 P. (2d) 803 (1943) (compulsory flag salute held unconstitutional); *West Virginia State Board of Education v. Barnette*, 319 U. S. 624, 87 L. Ed. 1628, 63 S. Ct. 1178 (compulsory flag salute unconstitutional); and *Pierce v. Society of Sisters and Hill Military Academy*, 268 U. S. 510, 69 L. Ed. 1070, 45 S. Ct. 571, 39 A. L. R. 468 (1925) (compulsory attendance of all children at public schools held unconstitutional) illustrate the second class of cases upon which appellant relies. They are distinguishable from the instant case; they involve statutes requiring affirmative action by the individual, with a penalty for refusal to act. Such is not the instant case.

It is unfortunate that the case of *Chapman v. Shreveport,* (1954) No. 116282, First District Court, Caddo Parish, Louisiana, is unreported. On casual examination, it would appear to support a conclusion contrary to the one we have reached. In it, the trial judge said:

"The basic and, to our mind, the decisive issue in this case, is plaintiff's contention that the City Council has no delegated authority to fluoridate the City water supply."

After pointing out that the only specific reference to disease in the city charter is contained in the following language:

"To make regulations not in conflict with the laws of the state, for the maintenance of cleanliness and sanitary conditions within the city, and to prevent the introduction and spread of *contagious* diseases; . . . " (Italics ours)

the trial court concluded that the city council had no delegated authority to fluoridate the water. The balance of the opinion, to our minds, is *dictum* not necessary to the decision in the case. The trial judge subtly adopts the arguments of the scientific opponents of fluoridation. Although the relevancy of that question is denied on the one hand, it is nurtured on the other. That there are two sides to this question (with which we cannot concern ourselves), appears in considerable detail in the opinion of Judge Artl in *Kraus v. Cleveland,* 116 N. E. (2d) 779 at page 790, under the heading, "Review of the evidence as to the efficacy and safety of the fluoridation program." This decision of the court of common pleas of Ohio is a well-considered opinion, holding constitutional ordinances providing for the fluoridation of the Cleveland water supply. On appeal, the *Kraus* case was affirmed in 121 N. E. (2d) 311 (1954); the *Chapman* case, *supra,* was reversed in 74 So. (La.) (2d) 142 (1954).

Finally, neither the alliterative term "compulsory mass medication" nor reference to the fluoridated water as a "concoction" describes the situation before us; nor does the possible opprobrium, which may flow from their use, overcome the police power.

We are convinced by the reasoning of the *Kraus, Dowell, Chapman,* and *DeAryan* cases, *supra.* The trial court did not err in concluding that the ordinance was a valid exercise of the police power and violated no constitutional rights guaranteed to appellant.

 Appellant's remaining assignments of error are directed to the trial court's conclusions: (1) that whether ordinance No. 653-A properly specified an emergency is immaterial since no referendum petitions were presented to the city clerk within thirty days after the ordinance was passed; (2) that the city is not engaged in selling drugs, practicing medicine, dentistry, or pharmacy as defined by statute; and (3) that the appropriation of funds under the ordinance to effect its purpose was valid under applicable state law.

We have considered these assignments of error. It would add nothing to discuss them in detail. They are not well taken.

The judgment is affirmed.

MALLERY, SCHWELLENBACH, FINLEY, and OLSON, JJ., concur.

HILL, J. (dissenting)—I repeat, for ready reference, findings of fact VI and VII:

"VI. That although fluoride is a deadly poison used commercially for the extermination of rats and other vermin, the addition to the municipal water supply of Chehalis of a source of fluoride ion, such as sodium silico fluoride, in the proportion of one part per million will not amount to a contamination and the water will continue to be wholesome. That chlorine is added to water to affect either bacteria or plant life in the water, while fluoride has no effect upon the water or upon the plant life in the water but remains free in the water and is artificially added solely for the effect it has on the individual drinking the water.

"VII. That dental caries, commonly referred to as tooth decay, is a very common disease of mankind. That tooth decay is neither infectious or contagious. That the addition of fluoride to the Chehalis water supply is intended solely for use in prevention of tooth decay primarily in children up to 14 years of age, and particularly between the ages of

6 and 14 and will prevent some tooth decay in some children."

Fluoridation has been and continues to be a highly controversial issue; however, in the absence of any assignment of error to finding No. VI, we must accept, for the purposes of this case, the finding that fluoridation such as here contemplated "will not amount to a contamination and the water will continue to be wholesome." Nor is it any concern of ours, in this case, whether the city of Chehalis would be liable for the consequences of contamination of the water supply if the fears and misgivings of the appellant's experts should prove something less than groundless.

The principal contention raised by the appellant is that the ordinance deprives him of "liberty . . . without due process of law," in violation of the constitution of the United States, amendment 14, and of the constitution of the state of Washington, Art. I, § 3.

What, then, is the liberty of which appellant is deprived? It is argued that the ordinance does not compel him to do anything; it subjects him to no penalty; and the city's obligation to appellant is fulfilled by the furnishing of water which is wholesome and free from contamination.

The deprivation of liberty involved in the enactment of the ordinance in question stems from the following facts:

(1) That appellant will be *compelled* to drink the water because there is no other practical source of supply (finding of fact No. V);

(2) That fluoridation has no effect upon the water or the plant life in the water, but fluorides are added *solely for the effect they have on the individual who drinks the water* (finding of fact No. VI);

(3) That the addition of fluorides is intended *solely for use in the prevention of tooth decay*, primarily in children up to fourteen years of age (finding of fact No. VII);

(4) That fluorides are readily available by prescription for topical application to teeth and for use in milk, water, and salts (no finding on this point, but testimony to that effect is undisputed).

We are not here concerned with any question as to appellant's right to be furnished wholesome water, or with any other rights which he might have in connection with the city's duty to furnish water. The significant circumstances are that the ordinance is designed solely for the purpose of effecting the application of fluorine to the teeth of the residents of Chehalis in order to minimize tooth decay in some children. The use of the city water system as a means of accomplishing this purpose means that the aforesaid "treatment" becomes compulsory for any person who has to rely upon the city water supply as his source of drinking water. Thus the liberty of which appellant is deprived is the right to decide of his own free will whether he desires to apply fluorine to his teeth for the purpose of preventing tooth decay, based upon his own opinion as to whether it would be advantageous or disadvantageous to his personal health—a matter, incidentally, on which there is marked and bitter divergence of opinion within the medical and dental professions.

It must be conceded that this is a personal liberty which falls within the constitutional protection of due process. In Mott on Due Process of Law 590, § 236, it is stated:

"There seems to be a deep-seated conviction in the Anglo-Saxon mind that a certain independence of action is valuable for social and political progress, and this can only be sacrificed when social considerations make it imperative to do so. Since it arose out of this conviction, due process has always been a social guarantee. It has always stood for the proposition that freedom of action as well as private property has a social value as well as an individual. It is, consequently, very closely related to the doctrines of natural law and inalienable rights."

In Interests of Personality, 28 Harv. L. Rev. 343, 356 (1915), Professor Roscoe Pound classifies the interests in the physical person that are entitled to recognition and enforcement by the state:

"Secondly and closely related [to immunity from bodily injury] is the preservation and furtherance of bodily health. Third and hardly less important is immunity of the will

from coercion, freedom of choice, and judgment as to what one will do."

The question of fluoridation involves a combination of these two elements, namely, "freedom of choice" as to measures to be adopted for "the preservation and furtherance of bodily health."

What, then, is respondent city's justification for this encroachment on personal liberty? The ordinance is sought to be upheld as a valid exercise of the city's police power as authorized by the state constitution, Art. XI, § 11, and as delegated by RCW 35.23.440 (27).

The precise issue involved in this case is succinctly stated in a comment in 3 Hastings L. Journal 123, 129 (1952):

"Correlative with the rights of police power in the state are inherent individual rights. The Constitution secures to each individual the right to life and liberty. The state cannot infringe upon nor deprive an individual of these rights. These rights, too, must be reasonably exercised. They are not absolute rights. Rather they are subject to reasonable restraint—'liberty regulated by law.' An exercise of police power depriving an individual of any of these rights must conform to due process. To answer what is due process, we look back to our definition of police power. It is a reasonable and unarbitrary restraint or deprivation brought about to accomplish a legitimate public purpose. In the case of fluoridation, the asserted right of the state is protecting and promoting the public health against dental caries. The right of the individual is the right to liberty."

In Freund on Police Power 116, § 123, it is said:

"Measures directly affecting the person in his bodily liberty or integrity, represent the most incisive exercise of the police power. Only the emergency of present danger therefore can justify quarantine, isolation or removal to hospital and compulsory treatment, and it is at least doubtful whether vaccination can be made compulsory apart from such necessity."

In the same text, p. 133, § 143, it is pointed out that one of the tests to be applied to a proposed health regulation is the question: Is it possible to secure the object sought without impairing essential rights and principles? Applying

that test question to the present case, the answer must be in the affirmative because it appears in the record, and is nowhere denied, that anyone who wants or needs fluorine can secure fluorides on prescription for topical application or to be taken into the system with milk, water, salt, or in other ways.

The supreme court of the United States laid down a test of the validity of compulsory health regulations which invade bodily liberty (vaccination) in *Jacobson v. Massachusetts*, 197 U. S. 11, 49 L. Ed. 643, 25 S. Ct. 358 (1904). Mr. Justice Harlan, in the course of the opinion, used the following quotation from *Crowley v. Christensen*, 137 U. S. 86, 89, 34 L. Ed. 620, 11 S. Ct. 13 (1890):

" 'Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint *under conditions essential to the equal enjoyment of the same right by others.* It is then liberty regulated by law' " (Italics mine);

and later said:

"There is, of course, a sphere within which the individual may assert the supremacy of his own will and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will. But it is equally true that in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, *under the pressure of great dangers*, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." (Italics mine.)

The proposed infringement of the individual's constitutional right of freedom of choice in matters relating to his own bodily care and health certainly is not justified by "conditions essential to the equal enjoyment of the same right by others," suggested as the basis for the restriction of individual freedom in *Jacobson v. Massachusetts, supra.* Nor is it justified by "pressure of great dangers" to the public health.

While dental caries may be termed a "disease" which is prevalent in the teeth of almost everyone, it is not contagious or communicable in any way. Dental caries in no way endangers the public health in the sense that its existence in the teeth of one individual might adversely affect the personal health of any other individual. To thus extend the concept of "public health" would open the door to compulsory mass medication or preventive treatment for any disease, solely on the ground that it is for the individual's own good, without regard to his inherent right to determine such matters for himself.

We are in accord with the language of Judge Galloway in the very recent case of *Chapman v. Shreveport,* No. 116,282, First Dist. Court, Caddo Parish, La. (1954):

"Under the facts of this case as we understand and have stated them, it is our opinion that fluoridating the City water supply bears no reasonable relation to the public health. . . .

"We advert to the scientific evidence concerning the nature and cause of dental caries, or tooth decay. It is not contagious and cannot be transmitted from one person to another. No person or segment of the population having that condition can, on that account, have any adverse effect on the health, dental or otherwise, of the general public or any member or segment thereof. We repeat, in our opinion this is not a matter of the public health. It is strictly within the realm of individual and personal dental health and hygiene within which each person should be free to choose his course for himself and those for whom he is responsible in the family relation. To this field the just powers of the government do not extend."

Nothing that was said by the supreme court of Louisiana in reversing Judge Galloway (*Chapman v. Shreveport,* 74 So. (2d) (La.) 142 (1954)) has changed my opinion as to the soundness of the statement I have just quoted.

Respondent city and its expert witnesses protest against the use of the phrase "compulsory mass medication." It would seem, in Shakespearean phraseology, that they "protest too much." They concede that fluoridation has no effect upon the water and they urge it solely for the effect it has

upon the individual who drinks the water. But they say it is not medication because it does not cure anything; it is intended merely to prevent dental caries.

Medication, in lay understanding, includes prophylaxis or preventive measures when applied to the individual. We hear much of preventive medicine. "The practice of medicine . . . consists of the use of drugs or medical preparations in or upon human beings, . . ." RCW 18.71.010. The Federal food, drug and cosmetic act defines the term "drugs" as ". . . articles intended for use in the diagnosis, cure, mitigation, treatment, or *prevention* of disease in man. . . ." (Italics mine.) 21 U. S. C. A. (Sup.), § 321(g). I do not believe that respondent city would seriously contend that the prescribing of drugs for preventive purposes does not constitute practicing medicine. If, however, it is the position of respondent city and its experts that, while giving a preventive prescription is practicing medicine, the prescription, when filled, is not medicine and, when used, is not medication, they are dealing in refinements which escape the lay mind and which are not reflected in current terminology.

The foray into semantics by each of respondent city's experts, all of whom deplore the use of the phrase referred to, and even the statement in the majority opinion that that phrase does not describe "the situation before us," fail to convince me that "compulsory mass medication" is not an accurate and concise expression of both the purpose and the effect of fluoridation.

The majority cites cases approving fluoridation, each making a plausible case for it. They all say, in effect, as the majority says here: "We fail to see, however, where any right of appellant, guaranteed by the constitution, has been invaded." It would, of course, be easier to see if the ordinance under question required every resident of Chehalis (or even every child under fourteen years of age resident therein) to present himself or herself for topical application of fluorides by public health authorities. On the showing here, it would not even be contended that such an

ordinance would be constitutional; yet the instant case is no whit different. What the residents of Chehalis could not be compelled to do one by one, it is now sought to compel them to do *en masse*; a treatment to which they individually could not be compelled to submit is here sought to be applied by more subtle but no less compulsory means. This smacks more of the police state than of the police power.

We were meticulously careful, in the recent case of *State ex rel. Holcomb v. Armstrong,* 39 Wn. (2d) 860, 239 P. (2d) 545 (1952), to make it clear that no specific treatment was prescribed by the regulation there in question. In that case, on the basis of the existence of a clear and present danger, we upheld the right of the regents of the state university to require all students to have chest X-ray examinations for the purpose of discovering possible tubercular infection. We said that the "primary concern is not for the possibly infected student, but is for those jeopardized by contact with such an individual."

Up to now, the basis for the restriction of the liberty of the individual has been that he would not be permitted to jeopardize the health or safety of others. It has been generally stated that the state, under its police power, has the right and duty to protect the health and welfare of its people; that the legislature (or municipality to which exercise of the police power has been delegated) is vested with a wide discretion, not only to determine what the public interest requires, but also to determine what measures are necessary to protect that interest; and that the inquiry of this court is limited to determining whether the object of the statute is one for which the police power may legitimately be invoked and, if so, whether the act bears a reasonable and substantial relation to the object sought to be attained. *State ex rel. McBride v. Superior Court,* 103 Wash. 409, 174 Pac. 973 (1918); *McDermott v. State,* 197 Wash. 79, 84 P. (2d) 372 (1938); *State v. Sears,* 4 Wn. (2d) 200, 103 P. (2d) 337 (1940); *State v. Boren,* 36 Wn. (2d) 522, 219 P. (2d) 566, 20 A. L. R. (2d) 798 (1950).

It is urged that inasmuch as the protection of dental health is an object for which the police power may legitimately be invoked, and fluoridation reasonably tends to promote that object, the limits of judicial inquiry are thereby satisfied. With this I cannot agree, at least in so far as the proposed regulation attempts to achieve such an object by compulsory treatment and consequent invasion of bodily liberty. I do not mean to infer that the protection of dental health can never under any circumstances be a proper subject of the exercise of the police power. There is a great difference between saying, as we did in *State v. Boren, supra,* that the state has a right to control who shall practice dentistry because the state has a duty to people who *choose to go* to dentists to protect them from incompetents and charlatans, and saying that people can be compelled to have their teeth treated whether they need treatment or want it, which is what the respondent city is attempting to do here. In short, I think that prevention of dental caries by compulsory treatment of the teeth does not fall within the scope of protection of the public dental health for which the police power may be invoked.

If fluorine is indeed the key to dental health and the application of fluorides is readily available to all who desire it, then education and persuasion, not compulsion, seem to be called for. Compulsion is justified on occasion for the protection of the public when dealing with contagious disease, but when we search for the "pressure of great dangers" in the instant case, it simply is not there. The ordinance providing for fluoridation is unconstitutional on the ground that it is an unwarranted and unjustified invasion of the liberty guaranteed the appellant by the United States constitution, amendment 14, and by our state constitution, Art. I, § 3.

No reference has been made to the first amendment of the United States constitution. Appellant apparently has no religious scruples against fluoridation or, if he has, he does not urge them. He does argue, however, that there is no distinction between the "pressure of great dangers" test laid

down in *Jacobson v. Massachusetts, supra* (a fourteenth amendment case) and the "clear and present danger" test first laid down in *Schenck v. United States,* 249 U. S. 47, 63 L. Ed. 470, 39 S. Ct. 247 (1919) (a first amendment case), which test we recently recognized and applied in *State ex rel. Holcomb v. Armstrong, supra.*

If appellant's contention be limited to a situation like the present, I can agree. However, the supreme court of the United States has pointed out on several occasions that there is a distinction, and that the rights guaranteed by the first amendment rest upon a firmer, or at least a broader, foundation than does the liberty protected by the fourteenth amendment. *West Virginia State Board of Education v. Barnette,* 319 U. S. 624, 87 L. Ed. 1628, 63 S. Ct. 1178, 147 A. L. R. 674 (1943); *Thomas v. Collins,* 323 U. S. 516, 89 L. Ed. 430, 65 S. Ct. 315 (1944). The former are concrete, the latter abstract, hence more vague and difficult of definition. However, since the liberty with which we are concerned is neither vague nor uncertain, this distinction is a matter of no concern in the present case except to indicate that an equally strong, if not a stronger, case could have been made by a proper party plaintiff for the unconstitutionality of the ordinance in question as a violation of the first amendment of the United States constitution.

I dissent. The judgment should be reversed.

HAMLEY, J., concurs with HILL, J.

DONWORTH, J. (dissenting)—The issue in this case is whether the individual citizen is to be allowed to decide for himself what medicine he will or will not take, or whether the city council (or commissioners) and the state board of health are to decide this question for him and force the dosage down his throat by mixing it in the municipal water supply. For the reasons stated by Judge Hill in his dissenting opinion, I am convinced that the ordinance of the city of Chehalis deprives appellant of the liberty guaranteed him by the provisions of the Federal and state constitutions referred to therein.

It has been suggested that the proposed introduction of fluoride ion (such as sodium silico fluoride) into the municipal water supply in the proportion of one part per million is such a trivial matter that no one should be seriously concerned about it. On the contrary, it seems to me that the priniciple involved is of far-reaching consequence because, if the city council (or commissioners) may legally inject any such medicine into the water, they have the right to put into it any medicinal agent from patent medicines to antibiotics (so-called "wonder" drugs) which *they* may from time to time determine to be beneficial to the public health. The practical result is no different than if the municipal authorities forcibly compelled the water consumer to take a daily dosage of such medicine from a spoon because he must either consume it or cease to drink water from the municipal water system.

By so doing, the municipal authorities, instead of the individual citizen, arrogate to themselves the sole right to decide what medicine is good for the health of the water consumers, and thereby the municipal water system becomes a direct conduit for the transmission of medicine from the apothecary's pestle to the mouth of the patient without the latter's consent. Thus will the people be deprived of a very important part of their constitutional liberty under our republican form of government, and the police state will be substituted for the police power of the state.

I desire now to call attention to an additional reason which supports the conclusion reached by Judge Hill.

The city of Chehalis is operating a municipal utility in its proprietary capacity pursuant to statutory authority to maintain, conduct, and operate waterworks for the purpose of furnishing its inhabitants with an ample supply of *water* for all uses and purposes with full power to regulate and control the use, distribution and price thereof. Rem. Supp. 1947, § 9488 [*cf.* RCW 80.40.010]. *Russell v. Grandview,* 39 Wn. (2d) 551, 236 P. (2d) 1061, and cases cited.

It will be noted that the city has authority only to furnish its inhabitants with an ample supply of *water*. Fluoride is

not water and has no effect upon either bacteria or plant life in the water (finding VI) and is intended solely for the prevention of tooth decay primarily in young children (finding VII). It is not used to make the water itself more healthful or to prevent its contamination by bacteria or other noxious matter. It is to be used solely for medicinal purposes, and, when mixed with water, the resulting mixture is a medicine.

The exercise of the city's police power to protect the health of its inhabitants is a governmental function. *Hutton v. Martin,* 41 Wn. (2d) 780, 252 P. (2d) 581. But a city may not under the guise of exercising its police power arrogate to itself in its proprietary capacity the right to forcibly distribute medicine to its inhabitants through its municipal water system. Its statutory authority is to furnish water. It is in the same position as a private corporation operating a waterworks. *Russell v. Grandview, supra.* The fact that that municipal corporation is exercising two functions (one governmental and the other proprietary) does not change the situation nor increase its statutory authority to operate a waterworks so as to purvey medicine to its customers.

To illustrate, could a municipality operating a municipal transit system refuse to permit a person to become a passenger unless he produced a certificate that he has submitted to the topical application of fluorides? Could such a person be denied service by a municipal light and power system or by a municipal garbage collector except upon such conditions?

Assuming that a city under its police power may under proper circumstances compel the inhabitants to submit to certain treatment for the prevention of disease, such city has no authority in its proprietary capacity to perform any act not expressly or by necessary implication authorized by the statutes granting it the right to engage in a particular municipal business.

Here, the act of the city in furnishing its inhabitants with medicine instead of water (which is the only beverage which the legislature has empowered it to furnish) is *ultra*

*vires* and the ordinance purporting to authorize such action is void. See *Woodward v. Seattle,* 140 Wash. 83, 248 Pac. 73, where this same municipal utilities statute was construed and the legislative grant of power to operate electric and "other railways" was held not to include the operation of motor busses by the city.

The majority opinion states that the ordinance is not in conflict "with general laws" under Art. XI, § 11, of the state constitution delegating to municipalities a portion of the state's police power concerning matters of health. This view may be correct, but that fact does not make up for the lack of authority in the city in its proprietary capacity to furnish medicine instead of water only.

It is further stated in the majority opinion that no constitutional right of the inhabitants is invaded because the ordinance does not compel them to do anything and that no penalty is attached for refraining to drink the water with the medicine in it. No suggestion is made as to which beverage the inhabitants should drink in lieu of this concoction. Here the city's water system is the sole source of drinking water which is necessary to sustain life. The penalty for not drinking the medicine is to compel the unwilling customer of the municipal water system to buy some bottled beverage or move to another city where only water is pumped through the water mains. Either alternative is as serious a penalty as a fine or imprisonment imposed by a police court.

The inhabitants of Chehalis have bought and paid for a municipal water system for the purpose of obtaining the ample supply of *water* which the legislature authorized, and those who do not wish to have medicine purveyed to them in their water are entitled to receive exactly what the legislature intended them to have, to wit, water.

For the additional reason that ordinance No. 653-A of the city of Chehalis is *ultra vires* and void because of the city's lack of authority to sell medicine in the manner proposed, as well as for the reasons stated in Judge Hill's opinion, I am

of the opinion that the judgment should be reversed and the proposed fluoridation enjoined.

HILL, J., concurs with DONWORTH, J.

HAMLEY, J. (dissenting)—I fully agree with the dissenting views expressed by Judges Hill and Donworth. Judge Hill's presentation of the constitutional question seems to me unanswerable. That Judge Donworth's extensive discussion of the *ultra vires* question is equally unanswerable is pretty well indicated by the fact that, on that important point, the majority opinion has only this to say:

"Nor do we agree that the fluoridation is *ultra vires* simply because the police power is exercised through a municipal agency operated by the city in its proprietary capacity."

The majority opinion appears to be based upon alternative theories, each of which seems to me unsound. The first of these is that no invasion of constitutional rights is involved because "the ordinance under consideration does not compel him [appellant] to do anything; it subjects him to no penalty . . ." On this ground, the majority distinguishes *State ex rel. Bolling v. Superior Court*, 16 Wn. (2d) 373, 133 P. (2d) 803 (compulsory flag salute); *West Virginia State Board of Education v. Barnette*, 319 U. S. 624, 87 L. Ed. 1628, 63 S. Ct. 1178, 147 A. L. R. 674 (compulsory flag salute); and *Pierce v. Society of Sisters and Hill Military Academy*, 268 U. S. 510, 69 L. Ed. 1070, 45 S. Ct. 571, 39 A. L. R. 468 (compulsory attendance at public schools).

In my opinion, this argument will not bear objective analysis. An employed homeowner in Chehalis must consume fluorides added to the water supply, or surrender constitutionally protected property rights in home and employment and move away (unless, of course, someone wants to suggest the quibble that such a person can buy bottled spring water). There are many who feel, as I do, that this penalty for refusing to consume fluorides is more severe than the nominal jail sentences and fines usually meted out for violation of an ordinance.

Can the state or one of its subdivisions of government circumvent constitutional controls by devising a regulation

which is practically incapable of avoidance, thereby making it unnecessary to prescribe a criminal penalty? If so, the area of governmental action thus released from constitutional fetters will be limited only by the ingenuity of man. If not, I do not see how this ordinance can stand.

The alternative theory upon which the majority opinion seems to be based seeks not to disclaim compulsion, but to defend it. The two cases cited in this section of the majority opinion sanctioned compulsory vaccination to protect against a contagious disease. The majority infers that the result would have been the same had the compulsion related to a noncontagious disease.

This alternative theory appears to follow this process of reasoning: The protection of public health is a valid exercise of the police power; the protection of public health includes protection from the introduction or spread of both contagious and noncontagious diseases; therefore, it is immaterial that the disease of dental caries is noncontagious rather than contagious.

In this process of reasoning, the majority, I believe, overlooks a very important limitation upon the exercise of the police power, which is that, whether the police power is being exercised for the protection of public health or for any other reason, it may not extend to the point of impairing a constitutionally guaranteed personal right, unless justified by "conditions essential to the equal enjoyment of the same right by others" (*Crowley v. Christensen,* 137 U. S. 86, 89, 34 L. Ed. 620, 11 S. Ct. 13), or by "pressure of great dangers" (*Jacobson v. Massachusetts,* 197 U. S. 11, 49 L. Ed. 643, 25 S. Ct. 358).

It is because of this limitation on the exercise of the police power that the courts have drawn a distinction between contagious and noncontagious diseases. *Jacobson v. Massachusetts, supra; Blue v. Beach,* 155 Ind. 121, 56 N. E. 89, 50 L. R. A. 64, 80 Am. St. 195. Where it is shown that, because of the contagious nature of a disease, a serious threat to public health is presented, the tests referred to above, for determining whether the exercise of the police power can

extend to the impairment of personal rights, have been met. By necessary inference, where it is shown that a disease is not contagious, these tests have not been met, and the indicated limitation upon the exercise of the police power applies.

The fact that dental caries is not a contagious disease is therefore material, since it is thereby established that the limitation on the exercise of the police power applies in this case. Any other view would, it seems to me, be an admission that the courts have been fooling all of this time when they have said that it is a valid exercise of the police power to interfere with constitutionally guaranteed personal liberties, where necessary to prevent the introduction or spread of *contagious* or *communicable* diseases.

The principle being established by the majority opinion, even more than the specific deprivation of personal liberty here accomplished, warrants deep concern. The case before us deals with what some will regard as a relatively minor aspect of dental health. But the principle announced is not so limited. It would be equally applicable if fluoridation (or iodination) was being relied upon to counteract goiter or any other noncontagious bodily malady. What future proposals may be made to treat noncontagious diseases by adding ingredients to our water supply, or food, or air, only time will tell. When that day arrives, those who treasure their personal liberty will look in vain for a constitutional safeguard. The answer will be: "You gave the constitution away in the *Kaul* case."

There is no contention in the instant case that the fluorides program represents the majority opinion of the citizens of Chehalis. No referendum vote was taken. Considering the results of referendum votes taken elsewhere, it is, to say the least, doubtful if such a program would meet with the approval of the people of Chehalis. At the November 2, 1954, elections, nine of the eleven American communities which voted on the proposition turned it down. Among these nine cities were Atlantic City, New Jersey; Salem, Oregon; Greensboro, North Carolina; and Fremont, Nebraska. The

proposition was approved in Palo Alto, California, and Mountain Home, Arkansas.

It may be that the voting citizens of our country have been influenced by a disquieting concern for their liberties which has so far failed to stir the judiciary.

But even were it to be assumed that the majority of the citizens of Chehalis approve of this move, that would not condone an impairment of constitutional rights. The constitutional guarantees are to protect the rights of the minority—not the majority. The majority does not need protection, because it does not do anything it does not want to do.

The question which I asked in my dissent in *State ex rel. Holcomb v. Armstrong,* 39 Wn. (2d) 860, 873, 239 P. (2d) 545, now becomes more urgent than ever:

"Can we, . . . withstand the insidious erosion [of our basic liberties] produced by a multiplicity of little instances where, as here, a guaranteed right is set aside because it interferes with what is said to be good for us?"

GRADY, C. J., HILL, and DONWORTH, JJ., concur with HAMLEY, J.

January 13, 1955. Petition for rehearing denied.