(No. 37592.—

ALICE SCHURINGA *et al.,* Appellants, *vs.* THE CITY OF CHICAGO *et al.,* Appellees.

*Opinion filed March 18, 1964.—Rehearing denied May 19, 1964.*

ALBERT W. DILLING and KIRKPATRICK W. DILLING, both of Chicago, for appellants.

JOHN C. MELANIPHY, Corporation Counsel, of Chicago, (SYDNEY R. DREBIN, WILLIAM KAFKA, and MARVIN E. ASPEN, Assistant Corporation Counsel, of counsel,) for appellees.

506

PETERSON, LOWRY, RALL, BARBER & ROSS, of Chicago, (OWEN RALL and PETER M. SFIKAS, of counsel,) for amicus curiae.

Mr. JUSTICE DAILY delivered the opinion of the court:

This suit, brought in the superior court of Cook County against the city of Chicago and certain of its officials, is a taxpayers' action to enjoin defendants from fluoridating the city's water supply. Because constitutional questions are involved, plaintiffs appeal directly to this court for review of a decree dismissing their complaint for want of equity. Upon leave granted, the Chicago Dental Society has filed a brief as amicus curiae in support of the decree.

The events leading to the action had their beginning on October 31, 1951, when a special committee of the city council was appointed to study water fluoridation from the point of view of public health. Public hearings were held as the result of which the committee concluded that fluoridation of water served to prevent dental caries, or tooth decay, and that it was in no way physically harmful, and recommended that fluorides be introduced into the city's water supply. Upon the basis of such study and recommendation, as well as an opinion of the corporation counsel that a fluoridation program would not violate constitutional or other legal rights, the council passed a resolution on June 16, 1954, declaring the fluoridation of the water supply to be in the interest of the public health and further providing, in part: "* * * that steps for the introduction of fluoride in a concentration adequate for safety and in accordance with the regulations prescribed by the Illinois Department of Health be undertaken by the City of Chicago through its Department of Water and Sewers with the cooperation of the Chicago Board of Health by January 1, 1955." Thereafter, the program and its manner of execution and administration were approved by the Illinois Department of Health and it was set into operation on May 1, 1956.

It appears that the city water supply, taken from Lake Michigan, has a natural fluoride content ranging from approximately .04 to .15 parts to a million parts of water. Under the program fluoride is added at strategic control points in quantities sufficient to maintain in the entire city system an optimum fluoride level of 1.0 part per million parts of water. There is no question but that the city uses the most advanced, safe and sanitary methods to inject the fluoride into the supply, and it also appears that constant tests to determine fluoride content are performed both by the city and the State.

Shortly after the program went into effect, the plaintiffs, suing as taxpayers and users of the city's water system, brought this suit for injunctive relief. One plaintiff is a dentist in general practice, two are housewives and the fourth, Walter Olson, is a practicing member of a religious sect which rejects the use of material medicine and relies upon spiritual means alone for healing disease. The cause was referred to a master in chancery to hear the evidence. After prolonged hearings and upon consideration of a voluminous record, the master made three basic findings of fact: (1) that fluoridation reduces dental caries by sixty per cent in children up to fourteen years of age; (2) that fluoridation of one part per million parts of water will not cause mottled teeth; and (3) that fluoridation to such extent will not cause systemic physical harm to the population as a whole. On the basis of such findings, as well as his conclusions that no legal rights were violated, the master recommended that plaintiffs' complaint be dismissed for want of equity. After exceptions to the master's report had been considered and overruled, such a decree was entered. This appeal has followed.

Essentially, plaintiffs' contentions are that the master's findings of fact are either unsupported by the evidence or against the manifest weight thereof, that the legislative action in question is an unreasonable, arbitrary and unwar-

ranted exercise of the police power, and that it infringes upon fundamental liberties protected by constitutional guarantees of due process of law. As to the plaintiff Olson it was contended below and in the brief filed in this court, that the fluoridation program was compulsory medication which violated the right to religious freedom guaranteed him by the first and fourteenth amendments to the Federal constitution. However, the latter issue, no stranger to the halls of justice in the setting here raised, (See: *Dowell* v. *City of Tulsa,* (Okla. 1954,) 273 P.2d 859, 864, *certiorari* denied 348 U.S. 912, 99 L. ed. 715; *Readey* v. *St. Louis County Water Co.* (Mo. 1961,) 352 S.W.2d 622, 628,) has become moot and is no longer an issue in the appeal, under the circumstance that the plaintiff Olson has voluntarily withdrawn and obtained a dismissal of the appeal as it relates to him. It is axiomatic that this court, unless the public interest demands it, will not consider abstract or moot questions, (*cf. People ex rel. Lawrence* v. *Village of Oak Park,* 356 Ill. 154; *National Jockey Club* v. *Illinois Racing Com.* 364 Ill. 630,) and, moreover, the remaining plaintiffs are not injuriously affected by the operation of the legislation on such ground. *Cf. Klein* v. *Dept. of Registration and Education,* 412 Ill. 75, 87; *City of Chicago* v. *Rhine,* 363 Ill. 619, 626.

The police power of the State is a basic attribute of sovereignty which exists without any special grant or reservation in the constitution, (*Chicago Junction Railway Co.* v. *Illinois Commerce Com.* 412 Ill. 579; *Berry* v. *City of Chicago,* 320 Ill. 536,) and we may begin our consideration of the issues here raised with the statement of two elementary and undeniable principles. First, that the police power may be validly exercised in order to protect the public health, (*City of West Frankfort* v. *Fullop,* 6 Ill.2d 609; *People ex rel. Kerner* v. *Huls,* 355 Ill. 412,) and that the State of Illinois, as it may lawfully do, has delegated to its municipalities the police power to protect the public health

both generally, (Ill. Rev. Stat. 1963, chap. 24, par. 11—20—5,) and specifically with respect to water systems. (Ill. Rev. Stat. 1963, chap. 24, par. 11—139—8 (2); see also: *Gundling* v. *City of Chicago,* 176 Ill. 340.) Equally settled and certain is the concept that a police measure, to be beyond the pale of constitutional infirmity, must bear a reasonable relation to the public health or other purpose sought to be served, the means being reasonably necessary and suitable for the accomplishment of such purpose, (*Strub* v. *Village of Deerfield,* 19 Ill.2d 401; *Vissering Mercantile Co.* v. *Annunzio,* 1 Ill.2d 108; *Lawton* v. *Steele,* 152 U.S. 133, 38 L. ed. 385,) and the principle that courts will not interfere with legislation falling within the orbit of a municipality's police power unless there is a palpably arbitrary or unfair exercise of the power. (*City of Chicago* v. *R. & X. Restaurant,* 369 Ill. 65; *Chicago Cosmetic Co.* v. *City of Chicago,* 374 Ill. 384.) The first issues thus confronting us are whether the fluoridation of water is so related to the public health as to constitute it a proper exercise of the police power, and whether fluoridation is reasonably necessary and suitable for the protection of the public health.

And while the matter is one of first impression in this jurisdiction, it is a question which has been the subject of much litigation in our time. In this country, on the occasions where the matter has been subjected to judicial scrutiny, there has been unanimous accord that the fluoridation of water by one part of fluoride to a million parts of water is a reasonable and proper exercise of the police power in the interest of the public health, and that it is not subject to constitutional infirmities thus far conceived. (See: *Chapman* v. *City of Shreveport,* 225 La. 859, 74 So. 2d 142, *certiorari* denied 348 U.S. 892, 99 L. ed. 701; *Kraus* v. *City of Cleveland,* 163 Ohio St. 559, 127 N.E.2d 609, *certiorari* denied 351 U.S. 935, 100 L. ed. 1463; *Dowell* v. *City of Tulsa,* (Okla. 1954,) 273 P.2d 859, *certiorari*

denied 348 U.S. 912, 99 L. ed. 715; *de Aryan v. Butler,* 119 Cal. App. 2d 674, 260 P.2d 98, *certiorari denied* 347 U.S. 1012, 98 L. ed. 1135; *Froncek* v. *City of Milwaukee,* 269 Wis. 276, 69 N.W.2d 242; *Readey* v. *St. Louis County Water Co.* (Mo. 1961,) 352 S.W.2d 622; *Baer* v. *City of Bend,* 206 Ore. 221, 292 P.2d 134; *Kaul v. City of Chehalis,* 45 Wash. 2d 616, 277 P.2d 352; *City of Fort Pierce* v. *State ex rel. Altenhoff,* (Fla. 1962,) 143 So. 2d 879; *cf. Wilson* v. *City of Council Bluffs,* 253 Ia. 162, 110 N.W. 2d 569.) On the other hand, we are told in plaintiffs' brief that the highest courts of Canada and Sweden have ruled against fluoridation, the former apparently concluding that such a program was beyond the statutory authority of municipalities, (*Municipality of Metropolitan Toronto* v. *Village of Forest Hill,* (1957) 9 D.L.R.2d 113,) and the latter apparently concluding, among other things, that there were possibilities of risk and disadvantage to health. (*Association for Promotion of Health* v. *Town of Norrkopping,* (Sweden, 1961). The High Court of Dublin, Ireland, to the contrary, shares the American view to date that fluoridation of public waters is neither physically harmful nor legally improper. *Ryan* v. *Attorney General,* (1963.)

On approaching the factual issue of whether the fluoridation of drinking water by one part per million is reasonably related to and suitable for the protection of the public health, it may be said to be uncontradicted that dental caries, or tooth decay, presents a continuing and unsolved problem of general health on a national scale, and that it is a disease from which no community, level of society or age group is immune. Fluorides, in varying proportions, exist naturally in the water supplies of many areas and at a time in history we take to be around the early 1930's, it was discovered that dental experience was significantly different in such areas. Generally speaking, those differences were a lower percentage of tooth decay, and in some areas, an incidence of mottled teeth, or chronic endemic fluorosis.

The result of these discoveries was extensive scientific study, research, testing and experimentation which ultimately laid the basis for the program of artifically fluoridating public drinking waters.

Reduced to their simplest terms, the general scientific conclusions reached were: that the ingestion of fluoridated waters results in a hardening of tooth enamel which makes for greater resistance to tooth decay; that the beneficial effects develop in the human body from birth through the ages of 12 to 14 years, being the period when the dentine and enamel of permanent teeth are being formed; that the protection acquired in the formative stages carries over into adult life; that the ingestion of fluorides in moderate amounts has no harmful effects on the human body; and that seriously mottled teeth occur only where excessive amounts of fluorides are ingested. Based upon these findings, and with the endorsement of various scientists, dental associations, health and medical groups, and governmental agencies, (*e.g.* the United States Department of Health and in our own jurisdiction the Illinois Department of Health,) many cities, starting in the early 1950's, began fluoridating public water supplies as a health measure.

As could be expected, however, artificial fluoridation has not been entirely free from sincere and conscientious objection on the part of some scientific and medical men, and proposals to pursue such a program have been expressly rejected in some communities. In the present case plaintiffs introduced evidence, largely through the medium of expert opinion, to the effect that the ingestion of fluorides has no appreciable effect upon the reduction of dental caries, or at least a doubtful and as yet undetermined effect; that it merely delays and postpones tooth decay rather than preventing it; and that the whole problem of tooth decay, as well as its solution, is a matter of diet and nutrition in which fluorides are neither necessary nor a factor. Defendants' expert witnesses, for the most part men with

long and extensive experience in the actual research and testing which has gone into the scientific effort to determine the relationship between the fluoride content of water and dental caries, testified exactly to the contrary. According to their opinions fluoridation has and does result in a direct reduction of dental caries among children, and by fluoridating Chicago's water supply at a level of one part per million decay will be reduced in the permanent teeth of children by as much as 50 to 60% after a period of 10 years.

Fluoride is a toxic substance, which is not an essential element of the human body, and when introduced into the system by whatever means is in part absorbed and accumulated in bones and body tissues, as well as in the teeth. While conceding that the susceptibilities of the particular individual and the amounts of fluoride involved are factors, plaintiffs' experts were of the opinion that one of the long range effects of fluoridating public drinking water could be the development of chronic fluoride poisoning in a substantial number of citizens. Such a condition, they stated, would interfere with certain natural body processes as its primary effect, and as possible secondary effects could cause nausea, vomiting, constipation, diarrhea, changes in the hair, skin and nails, skin eruptions, abnormal bones and kidney stones. Additionally, they testified that damage would result to the kidneys, liver and other vital organs; that the nervous system would be directly and harmfully affected; that the spine would be affected; that loss of muscle power and altered reflexes would occur; and that the poisoning would interfere with reproduction, decrease fertility, decrease the mother's milk supply, increase still births and stunt growth. They classified diabetics, people susceptible to allergies, arthritics and women during pregnancy and menstrual periods as groups particularly sensitive to any intake of fluoride. One of the plaintiffs, a practicing dentist who examined only 16 to 18 young patients a year, testified that since the commencement of fluoridation of

water in Chicago he had observed gum damage in the mouths of children. This was flatly contradicted by witnesses for defendants who examine thousands of children each year.

Based upon tests with animals, upon statistics relative to fluoride poisoning, upon tests and studies of the retention and excretion rate of fluoride in the human body, upon medical experience and upon a series of autopsies performed upon bodies of persons living where the water supply had a natural fluoride content of 2.5 parts per million parts of water, defendants' experts testified in essence that the lifetime consumption of water fluoridated by one part per million would have no harmful or adverse effects upon the human body, and were of the opinion that water fluoridated to such an extent could be safely ingested without cumulative toxic effect. More specifically, one defense witness testified that the ingestion of fluoride in such quantity and in such manner could not possibly have harmful effects upon bones, the kidneys, the heart or tissues of the body. According to another witness, only a small fraction of fluorides ingested is retained in the body, the greater portion being excreted naturally through the kidneys and sweat glands, and whenever the concentration of fluoride in the blood tends to rise the mechanisms which carry fluoride out of the blood also tend to increase their activity and to maintain a balance, unless overwhelmed by the sudden intake of large amounts of fluoride. In this connection, the witness stated that for the ingestion of fluorides to become dangerous a person would have to ingest at one time in the neighborhood of 1000 to 2000 times the amount that he could normally ingest in a day by drinking water fluoridated by one part per million.

On the subject of retention by the human body, a witness for plaintiffs testified there are variations from individual to individual, some retaining more than others, and it was his opinion that children who would retain the whole

intake of fluoride from Chicago's water would be susceptible to ill effects as time progressed. Over defendants' objection, the same witness was permitted to testify to an uncompleted experiment he was conducting by injecting fluoride in a concentration of 6.8 parts per million, (far in excess of the optimum level maintained by Chicago,) into a group of 30 persons, 20 of whom were already afflicted with fluorosis and 10 of whom were "not suspected of fluorosis." According to his preliminary findings and report, the persons suffering from fluorosis excreted an average of 25.6% of the fluoride administered, while the others eliminated an average of 57.1%.

There was a similar division of evidence and opinion on the issue of whether fluoridation by one part per million would result in widespread chronic endemic fluorosis, or mottled enamel. This condition, which has its beginning from the effect of fluoride on the enamel-forming cells of the tooth bud, does not effect the tooth structurally or functionally but presents largely a problem of cosmetics or esthetics. Its incidence follows no fixed pattern, individual differences and other variables again apparently playing a part, and it may range from mild to severe cases and varying degrees in between. In its mildest form, detectable only by the trained eye, the tooth appears bleached or chalky white in its entirety or in spots. Later, in the progression to a severe case, the enamel tends to become pitted and stained yellow, brown or almost black. Also, it appears that, for the most part, the condition ordinarily occurs on surfaces which are not apparent from outside the mouth.

Generally, it was the testimony of defendants' experts that in order for mottled teeth to occur the intake of fluoride would have to be excessive, one witness stating the concentration would have to be above three parts per million; that no disfiguring or severe mottling would occur where there was a concentration of only one part per million; that instances of dental fluorosis had been few and far between in

Chicago and other communities having a comparable program; and that a mottled tooth was preferable to a decayed tooth from the point of view of general body health. For the plaintiffs, an expert testified that 17% of the children drinking artificially fluoridated water from birth until they are old enough to have permanently erupted teeth will show some degree of mottled enamel, and a showing was made of statistical studies revealing the incidence of mottling, or suspected mottling, in communities where the natural fluoride content of their water supplies ranged from .2 to 1.2 parts per million parts of water. The statistician, however, who happened to be one of the expert witnesses for defendants, classified the cases of mottling as "mild" or "very mild" and, while we entertain some doubt as to the validity or consistency of his conclusion, testified in this cause that the statistical experience of other communities in this respect could not be projected to the city of Chicago.

We do not agree that the master's findings of fact are either against the manifest weight of the evidence, or in some instances without evidentiary support, as plaintiffs contend. A presumption of validity attaches to municipal enactments and regulations adopted under the police power and the burden of proving to the contrary is upon him who asserts the invalidity. (*Kieg Stevens Baking Co.* v. *City of Savanna,* 380 Ill. 303; *Stearns* v. *City of Chicago,* 368 Ill. 112.) And while, as we have noted, such legislative action is generally subject to judicial review to determine whether it is related to and reasonably necessary and suitable for the protection of the public health, safety, welfare or morals, courts will not disturb a police regulation where there is room for a difference of opinion, but in such case the legislative judgment will prevail. (*McCray* v. *City of Chicago,* 292 Ill. 60; *Dunlap* v. *City of Woodstock,* 405 Ill. 410.) Furthermore, the wisdom, necessity and expediency of police regulations are no concern of the courts, but are matters primarily for the legislative body of the mu-

nicipality, and courts are without power to interfere merely because they believe a different regulation might have been wiser or better. *City of Chicago* v. *Waters,* 363 Ill. 125; *Chicago Cosmetic Co.* v. *City of Chicago,* 374 Ill. 384.

From all of the evidence in this record, as well as the scientific, professional and legal authorities which have been brought before us, there appears to be extraordinary accord that fluorides act to prevent and reduce tooth decay, and that artificial fluoridation to the extent of one part per million parts of water will not, either presently or cumulatively, result in harmful systemic effects. Apart from the extensive scientific research which led to these conclusions, equally impressive are the painstaking legislative inquiries at Federal, State and local levels which have preceded the endorsement and adoption of fluoridation programs. As we see it, the closest factual issue arises over the question whether artificial fluoridation, to the extent here involved, will in fact produce what could be described as harmful effects in the matter of mottled teeth. At best, however, the evidence with respect thereto presents only a debatable question where there is room for difference of opinion, and while it is our belief the proof is more susceptible to a conclusion that severe and disfiguring endemic dental fluorosis will not result from artificial fluoridation to the extent practiced here, it is enough to say it is an area in which the legislative judgment must prevail. We conclude that the artificial fluoridation of water is reasonably related to the public health, and that the program adopted by Chicago is necessary and suitable for the protection of public health.

Departing from considerations directly related to bodily health, plaintiffs also contend that the Chicago program is arbitrary and unreasonable because it is wasteful and because it is being administered in a "haphazard" manner. We do not find that either point is well taken. The claim of haphazard administration is founded upon charts of daily tests which show that the fluoride content does not at all

times measure at precisely one part per million parts of water, but fluctuates in varying degrees slightly above or slightly below that figure. However, further proof shows that the absolute perfection for which plaintiffs contend is not possible to achieve, that the city tries and usually does maintain the proportion of fluoride so there will be .95 parts per million parts of water, and that the amounts of fluoride ingested in those instances where the content slightly excedes one part per million will not have present or cumulative harmful effects. We would add, too, it appears that the methods, tests and controls being employed to insure safety meet the highest standards.

The claim of a wasteful program arises from the fact that the program has had a capital outlay of roughly $500,000 and operational costs of about $350,000 a year, and from the circumstances that Chicago has but one system of pipes to distribute its water supply with the result that only a small fraction of the total fluoridated supply is actually ingested by the 6 to 14 age group it is intended to benefit. This, the plaintiffs urge, is a needless waste of public funds particularly in view of the alternate methods by which fluorides could be administered to children, as for example: by topical application, by pills dissolved in water, and by the use of fluoridated milk, mouthwash or toothpaste. There is, however, proof in the record that such alternative methods would not be as safe, economical and effective as the fluoridated water program, that they would not effectively accomplish the widespread public purpose of the program, that the only practical method of employing the beneficial effects of fluoride is by treating drinking water, and that the public expense and apparent waste of a part of the fluoridated water supply is more than offset by the beneficial results to be attained. Taking into account all of the circumstances, particularly the purpose of benefitting the entire population, we cannot say that the program is unreasonable or arbitrary on such ground. *Cf. Readey* v.

*St. Louis County Water Co.* (Mo. 1961,) 352 S.W.2d 622, 632; *Kraus* v. *City of Cleveland,* 163 Ohio St. 559, 127 N.E.2d 609, 612.

Finally, plaintiffs assert that the program is an improper exercise of the police power because tooth decay is not a communicable or epidemic disease; because only a small segment of the population, the city's children, are benefited; and because it subjects all users to mass medication in violation of the fundamental and inalienable right of each individual to determine whether or not they wish to be so treated. These constitutional claims have both their source and their unanimous rejection in the decisions of our sister States, heretofore cited, which have treated upon the problem and we see no useful purpose in a detailed analysis or repetition of the grounds for rejection. Suffice it to say that those well-reasoned precedents, with which we are in accord: (1) sustain the right of municipalities to adopt reasonable measures to improve or protect the public health, even though communicable or epidemic diseases are not involved; (2) hold that the benefits of fluoridation which carry over into adulthood absolve such programs of the charge of being class legislation; and (3) conclude that fluoridation programs, even if considered to be medication in the true sense of the word, are so necessarily and reasonably related to the common good that the rights of the individual must give way. *Cf. Jacobson* v. *Commonwealth of Massachusetts,* 197 U.S. 11, 49 L. ed. 643.

Two collateral issues remain to be considered. First, the contention of plaintiffs that the exercise of the police power here is invalid because it was accomplished by resolution rather than by ordinance; and second, the contention of defendants on cross appeal that the trial court erred in apportioning half of the master's fees and charges to the city of Chicago. We do not find, however, that the first issue was ever raised or passed upon in the trial court, with the result that it is not properly before us for review and will

not be considered. (*Pickus* v. *Board of Education,* 9 Ill.2d 599; *Zehender & Factor, Inc.* v. *Murphy,* 386 Ill. 258.) As to the second, it is axiomatic that the assessment and apportionment of fees and costs rest in the sound discretion of the trial court, (*McFail* v. *Braden,* 19 Ill.2d 108; *Jones* v. *Felix,* 372 Ill. 262,) and we perceive no abuse of discretion in this case. While the judicial view of artificial fluoridation has since become crystallized and fixed along discernible lines, the complaint filed in this proceeding, which has been unduly prolonged, reflects generally upon a time when the constitutionality of such programs was uncertain and when the bona fides of plaintiffs' action could not seriously be contested.

The decree of the superior court of Cook County was correct and is therefore affirmed.

*Decree affirmed.*