**Bruce LaVINE, as next friend of James LaVINE; James LaVine, Plaintiffs–Appellees,**

**v.**

**BLAINE SCHOOL DISTRICT, a municipal corporation; Tim Haney; Dan Newell; Karen Mulholland, Defendants–Appellants.**

No. 00–35303.

United States Court of Appeals, Ninth Circuit.

Jan. 29, 2002.

Before: B. FLETCHER and FISHER,

Circuit Judges, and SCHWARZER,* District Judge.

Order; Dissent by Judge REINHARDT; Dissent by Judge KLEINFELD

## ORDER

The panel has unanimously voted to deny appellees' petition for rehearing filed August 3, 2001. Judge Fisher voted to reject the suggestion for rehearing en banc, and Judge Fletcher and Judge Schwarzer recommended rejection of the suggestion for rehearing en banc.

The full court was advised of the suggestion for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R.App. P. 35(b).

The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.

REINHARDT, Circuit Judge, dissenting from denial of rehearing en banc:

While I agree with most of what Judge Kleinfeld says and therefore join his dissent, I do not share his bleak view of the effect of this decision on the rights of students in this circuit. I do not agree that the erroneous result arrived at in this case compels or authorizes this court, or district courts, in future cases, to uphold discipline that impinges on the First Amendment activities of students, even when those students are emotionally disturbed. I read the panel's opinion essentially as approving only a brief suspension of a student pending determination of the existence of a safety question. Because the Washington statute contained no express provision for immediate "suspension," the panel treated the "emergency expulsion" section as if it were such a provision. As Judge Kleinfeld so eloquently points out, in doing so, the panel erred—in my opinion, largely because it left the impression that it approved of the imposition of discipline, discipline that simply was not warranted and that violated the student's First Amendment rights.

Specifically, I do not join in the introductory paragraph of Judge Kleinfeld's dissent or in the first sentence of either the fourth or seventh paragraphs of the Analysis section. Otherwise, I agree fully with his dissent.

I would add only that at times like those this nation now confronts, it is especially important that the courts remain sensitive to the demands of the First Amendment, a provision that underlies the very existence of our democracy. *See Brown v. Hartlage,* 456 U.S. 45, 60, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982) ("[T]he First Amendment [is] the guardian of our democracy.") First Amendment judicial scrutiny should now be at its height, whether the individual before us is a troubled schoolboy, a right-to-life-activist, an outraged environmentalist, a Taliban sympathizer, or any other person who disapproves of one or more of our nation's officials or policies for any reason whatsoever.

KLEINFELD, Circuit Judge, with whom KOZINSKI, Circuit Judge, joins and REINHARDT, Circuit Judge, joins except as set forth in his separate dissent, dissenting from denial of rehearing en banc:

After today, members of the black trench coat clique in high schools in the

---

* Honorable William W Schwarzer, Senior District Judge for the Northern District of California, sitting by designation.

western United States will have to hide their art work. They have lost their free speech rights. If a teacher, administrator, or student finds their art disturbing, they can be punished, even though they say nothing disruptive, defamatory or indecent and do not intend to threaten or harm anyone. School officials may now subordinate students' freedom of expression to a policy of making high schools cozy places, like daycare centers, where no one may be made uncomfortable by the knowledge that others have dark thoughts, and all the art is of hearts and smiley faces. The court has adopted a new doctrine in First Amendment law, that high school students may be punished for non-threatening speech that administrators believe may indicate that the speaker is emotionally disturbed and therefore dangerous.

### Facts

During all the press hullabaloo about school shootings, James LaVine, like a multitude of columnists and oped writers, wrote about school shootings. His attempt to understand was then presented as a poem, and it is disturbing. His "Last Words," reproduced in the appendix, describes the feelings of a person who shot and killed twenty-eight people at a school two years before and decides to kill himself because he fears he may kill again. James, then in the eleventh grade, gave the poem to his English teacher for review. The teacher found the poem disturbing and showed it to the school guidance counselor, principal, and vice-principal.

School officials considered James troubled and troublesome. School records said that James was "involved in a domestic violence situation with his father," because James had parked his car in the barn after his father told him not to, his father threw a rock at James's car, and James called the police. James had twice been in fights with other boys involving pushing, hitting and kicking. Two years before, he had confided to the school counselor that he had thought about suicide. He had recently broken up with his girlfriend, whose mother later told the school that James was stalking her daughter. He had earned the vice-principal's ire for wearing a shirt that said "eat shit and die." All of us who remember high school recognize the picture, the sort of boy that the vice-principal in charge of discipline keeps his eye on.

James's English teacher read the poem on Friday night, found it disturbing, and called the school counselor the next morning. The counselor called the vice-principal. The three of them met, and the vice-principal decided to call the city police. The city police told him to call state Child Protective Services. Child Protective Services told him to call the Community Mental Health Crisis Line. A psychologist at the crisis line told the vice-principal that the police should bring James in for an evaluation. James lived outside the city police department's jurisdiction, so the police asked the county sheriff to do the welfare check on James to determine whether he should be detained for a mental evaluation.[1]

A sheriff's deputy interviewed James and his mother, got a copy of the poem, and ascertained that James had no access to weapons. James's mother did not believe that he was a danger to anyone. James and his mother agreed to speak to

1. *See* Wash. Rev.Code Ann. § 71.34.050(1) (West 2001) (authorizing a "county-designated mental health professional" to investigate information that a child thirteen or older "presents a likelihood of serious harm" as a "result of a mental disorder" and detain the child for evaluation).

counselors first thing Monday morning and apologize to the school faculty. The deputy sheriff telephoned the crisis line psychologist with his observations. The psychologist, based on the deputy's observations of the boy's behavior, and the information that the school district had provided, "determined that there was no legal cause for forcing the student to undergo a psychological examination." He gave the deputy sheriff his professional opinion. The deputy sheriff wrote in his report that "I found no probable cause existed to involuntarily commit James for a mental evaluation."

The principal consulted with his personnel, reviewed James's disciplinary history, learned the police weren't going to take action, and "emergency expelled" James.[2] The principal and vice-principal thought that James was threatening to kill people when they read the poem. They did not read it carefully. The poem describes, through a dramatic monologue by a murderer, killings that took place two years ago. The speaker says he now fears that he "may strike again," so he will instead kill himself. The principal concluded that "James did something terribly wrong when he wrote this poem" because "the poem is a threat." James was expelled for writing the poem, and the principal and vice-principal both said he would have been expelled with or without the two fights and the t-shirt.

The school board affirmed the expulsion, but directed that a back-dated letter be put in James's file to say that James had been expelled for safety rather than disciplinary reasons, although the principal and vice principal who expelled him had been unequivocal in their testimony that they did so because they regarded his poem as a threat in violation of the school's discipline policy. The district court's summary judgment order concluded that "[i]t is undisputed that the District's expulsion of James LaVine was motivated by the message contained in 'Last Words'" and that "[h]e was not disciplined for the context in which he delivered his poem, but explicitly and solely for the evocative nature of his poem."

After the expulsion, a child psychiatrist met with James and his parents three times and then decided "it was safe for James to return to Blaine High School." The expulsion was then lifted, and James returned to school without further incident. The psychiatrist wrote a letter saying that, had he been consulted prior to the expulsion, he would have recommended that "James be removed from school pending a mental health evaluation." He also signed a declaration filed in the summary judgment proceedings that "suicidal ideation, anti-social behavior, and written expression of homicide and suicide are indicators of a potential for violence."

James and his father sued for a judgment for damages on the ground that James's First Amendment rights were violated and for an injunction to remove the emergency expulsion from his file. The district court ruled on cross motions for summary judgment that, although the school could legitimately have made "a temporary suspension pending psychiatric examination," the expulsion was unconstitutional. It held that the LaVines were entitled to an injunction "preventing the placement or maintenance of any negative documentation of this incident in James LaVine's school file." Damages were to be

---

**2.** *See* Wash. Admin. Code § 180–40–295 (2001) (authorizing "emergency expulsion" where the school has "good and sufficient reason to believe that the student's presence poses an immediate and continuing danger to the student, other students, or school personnel ...").

determined in later proceedings. The district court did not certify the partial summary judgment for appeal pursuant to Federal Rule of Civil Procedure 54(b). The injunction was of course appealable under 28 U.S.C. § 1292(a)(1).

The district court found that it was "undisputed" that the school expelled James "solely for the evocative nature of his poem," that is, "the message contained" in it. And since " 'Last Words' was not a sincere expression of intent to harm or assault," the district court held that "the poem therefore falls squarely within the purview of the First Amendment's core protections." The district court then considered whether the expulsion was a narrowly tailored means of achieving the school's non-speech-related interest in protecting the safety of its students. The court held that it was not narrowly tailored, because "[a] temporary suspension pending psychiatric examination would have been a far less drastic measure and ultimately would have accomplished the defendants' purpose."

On appeal, the panel held that although the summary judgment was partial and interlocutory, because damages remained to be adjudicated, nevertheless it had jurisdiction to review it because the issue of constitutionality was "inextricably bound" up with the injunction.[3] The panel reversed the partial summary judgment.[4] Its holding appears to be that speech by a

student in high school can constitutionally be suppressed and punished if the school shows "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities."[5] The panel treated the expulsion as "trying to protect its students from potential violence," not as "trying to discipline James for his speech."[6]

## Analysis

The issue in this case is whether the school could *punish* James for what he said in his poem. The expulsion mechanism used against James is, as is set out below, a form of punishment. It is not unusual to hear some troubled person say things that give rise to the thought, "That person may be mentally ill or emotionally disturbed," and sometimes, "That person ought to be examined to determine whether he poses a danger to himself or others." Those conclusions, even assuming that they are well taken, do not justify *punishing* the speaker.

This case does not put at issue whether the school could, consistently with the Constitution, remove James pending psychiatric examination to ensure that he did not pose an unreasonable risk to the safety of other students. The district court only addressed whether the school could punish James with "emergency expulsion" for writing his poem. James's poem is disturbing. Reasonable school officials could have reasonably been concerned, based on

---

**3.** *LaVine v. Blaine School District*, 257 F.3d 981, 987 (9th Cir.2001).

**4.** *Id.* at 992. In my opinion, the panel had no jurisdiction to reach the merits of the partial summary judgment decision. The panel affirmed the injunction, but reversed the summary judgment on which the injunction was based. If the injunction could be affirmed whether the partial summary judgment was right or wrong, then the partial summary judgment could not properly be deemed "inextricably bound" up with the injunction.

That could be so only if the correctness of the partial summary judgment would control whether the injunction could be affirmed.

**5.** *LaVine*, 257 F.3d at 989 (quoting *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)) (internal quotation marks omitted).

**6.** *Id.* at 991.

his poem, and considering that he had once thought about suicide and experienced various disturbing events in his life, that James was a troubled and depressed boy. And they might have reasonably concluded that he ought to be examined by a psychiatrist before being allowed back into the school or into school events. The school administrators did not read the poem carefully enough to notice when it used the past tense and when it used the future tense, so they misread a dramatic monologue about a crime two years before as a statement that the monologuist intended to commit the crime in the future. Nevertheless, it is of legitimate concern when a boy in high school is preoccupied with thoughts about murder and suicide. Neither the LaVines, nor the district court, nor I, have taken issue with the proposition that James could properly be excluded from the school so that a psychiatrist could examine him and communicate a judgment about when it was safe to readmit him.

Punishment has meaning and consequences distinct from examination, counseling, and exclusion for health or safety reasons based on predictions about future conduct. As the district court proceedings on the injunction make clear, James and his father brought this case in part because the disciplinary expulsion in his school record has kept James from enlisting in the armed services. People are often asked on job and other applications whether they were ever "disciplined" in school, but not whether they were ever removed from school for medical reasons. School nurses commonly send children home when they appear to have communicable or dangerous medical conditions, such as impetigo, lice, measles, German measles, and chicken pox, and do not allow them to return until a doctor confirms that they are no longer dangerous to others. The Constitution does not permit the government to punish an individual for being ill, regardless of whether his illness is dangerous to others.[7] And the Constitution does not permit the government to punish people for the content of their speech, if it is not a "true threat,"[8] where the punishment is grounded on a prediction based on the speech that the individuals may commit crimes against others. James, though, was not treated like a child with measles, who would likely be referred by his teacher to the school nurse and then sent home until he was better. He was punished, by expulsion, as having broken the rules.

The panel decision creates a new First Amendment rule: where school officials perceive a major social concern about school safety, they may punish school children whose speech gives rise to a concern that they may be dangerous to themselves or others, even though the speech is not a threat, disruptive, defamatory, sexual, or otherwise within any previously recognized category of constitutionally unprotected speech.

The panel muddies the waters by saying that "when the school officials expelled James LaVine they acted with sufficient justification and within constitutional limits, not to punish James for the content of

---

7. *See Robinson v. California,* 370 U.S. 660, 666–667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (holding unconstitutional statute punishing drug addiction); *see, generally, Kansas v. Hendricks,* 521 U.S. 346, 361–364, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (contrasting civil commitment with imprisonment for committing a crime). *Cf. Powell v. Texas,* 392 U.S. 514, 532–33, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (holding constitutional a criminal statute against public drunkenness).

8. *Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (internal quotation marks omitted); *see also NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927–29, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982).

his poem, but to avert perceived potential harm."[9] This is mistaken as fact and law, and the district court was correct in its contrary conclusion. School officials punished James for making a threat. The vice-principal testified he "absolutely" took the poem "as a threat to murder" and "a violation of the disciplinary code." The principal testified that "James did something terribly wrong when he wrote this poem" and that the "poem itself" "violated the Blaine High School Discipline Policy" because it was "a threat." The official letter announcing the expulsion cited James for "violation of the Blaine High School Discipline Policy" and "impose[d] the sanction of emergency expulsion." Though mistaken on the record and state law in its assertion that the school "was not trying to discipline James for his speech,"[10] the panel evidently concedes that James's speech was not a "true threat" and was not punishable as such.

The applicable state law governing emergency expulsion establishes that it is punitive. School officials must show that a student poses an "immediate and continuing danger" to himself or others to justify immediate expulsion with a hearing afterwards.[11] The significance of the reference to "immediate and continuing danger" is not that the immediacy of the danger is the basis for expulsion, but rather that it is the basis for not delaying the expulsion until after the hearing.[12] The basis for the expulsion is "misconduct."[13] At the post-expulsion hearing on an emergency expulsion, the student gets a chance to explain his "alleged misconduct."[14] The determination at the emergency expulsion is "the guilt or innocence of the student."[15]

The panel consigns high schools to a constitutional black hole, where freedom of speech exists only to the extent that administrators are comfortable with it. That is not the law. *Tinker v. Des Moines Independent Community School District* holds that students "do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."[16] Regulations that directly interfere with speech, such as laws against libel, incitement to violence, threats, and obscenity, must fit within narrowly defined exceptions to otherwise absolute First Amendment protection.[17] The nature and purposes of schools, and the fact that their students are generally minors, allows for restraints that do not apply in other con-

---

9.  *LaVine*, 257 F.3d at 983.

10.  *Id.* at 991.

11.  Wash. Admin. Code § 180–40–295 (2001).

12.  *Compare* Wash. Admin. Code §§ 180–40–275, –280, –285 (authorizing expulsion after hearing) with Wash. Admin. Code §§ 180–40–295, –300, –305 (authorizing emergency expulsion followed by post-expulsion hearing) (2001). *See also* Wash. Admin. Code § 180–40–290 (2001) (authorizing emergency removal from class, subject, or activity).

13.  Wash. Admin. Code § 180–40–305(2)(d) (2001).

14.  *Id.*

15.  Wash. Admin. Code § 180–40–305(4) (2001).

16.  *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

17.  *See New York Times Co. v. Sullivan*, 376 U.S. 254, 281–83, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (defamation); *Brandenburg v. Ohio*, 395 U.S. 444, 447–48, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (incitement); *Watts*, 394 U.S. at 708, 89 S.Ct. 1399 (threats); *Claiborne Hardware*, 458 U.S. at 927–29, 102 S.Ct. 3409 (same); *Roth v. United States*, 354 U.S. 476, 485, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscenity).

texts,[18] but the general rule remains supportive of freedom of speech.

The panel purports to draw its rule, that school administrators may punish student speech if they can show "facts which might reasonably have led school officials to forecast substantial disruption of or material interference with school activities," from *Tinker*.[19] That reads *Tinker* through a mirror. *Tinker* held that it was *un* constitutional for the school to suspend students for refusing to take off their black protest armbands.[20] Its importance was to hold that the First Amendment *does* apply in schools, not that it doesn't.[21] The Court left open the possibility that punishment for refusing to remove the armbands might have been constitutionally permissible if there had been a "finding" and a "showing" that "engaging in the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school."[22] But its holding is not that suppression of speech in some circumstances is permitted, but rather that in the circumstance before the Court it was *not* constitutionally permitted.

The panel's errors on *Tinker* are these: (1) *Tinker* does not hold that a mere prediction that speech may interfere with discipline justifies suppression, it holds only the converse, that suppression is not justified in the absence of such a finding and

showing; (2) *Tinker* does not hold that a student may be punished for speech that, without intentional wrongdoing by the student, may disrupt discipline, but at most implies that, had the armbands been disruptive, the students could have been punished for refusing to obey an order to take them off, that is, to cease engaging in the prohibited expression; (3) *Tinker* requires a "showing," not a mere prediction based on amorphous concern.

*Bethel School District v. Fraser* reaffirmed the *Tinker* principle that "students do not 'shed their constitutional rights to freedom of speech at the schoolhouse gate.' "[23] *Bethel* held that a school could constitutionally punish a student for giving a lewd speech to a school assembly, after he had been told specifically that he was not permitted to make the speech, and disruption actually did occur (hooting, yelling, graphic sexual gestures among some students, embarrassment and bewilderment among others).[24] Under *Bethel*, schools may prohibit and punish "a vulgar and lewd speech" such as this one because it undermined the school's "basic educational mission" of teaching, among other things, civility in public discourse.[25]

*Hazelwood School District v. Kuhlmeier* again reaffirmed that "[s]tudents in the public schools do not 'shed their constitutional rights to freedom of speech or ex-

---

**18.** *See, e.g., Bethel School District v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (upholding punishment of student for indecent speech in school assembly); *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (upholding censorship of student articles in school-sponsored student newspaper).

**19.** 393 U.S. at 514, 89 S.Ct. 733 (quoted in *LaVine,* 257 F.3d at 989).

**20.** *Id.* at 514, 89 S.Ct. 733.

**21.** *Id.* at 506, 89 S.Ct. 733.

**22.** *Id.* at 509, 89 S.Ct. 733 (quoting *Burnside v. Byars,* 363 F.2d 744, 749 (5th Cir.1966)) (internal quotation marks omitted).

**23.** *Bethel School District v. Fraser,* 478 U.S. 675, 680, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (quoting *Tinker,* 393 U.S. at 506, 89 S.Ct. 733).

**24.** *Id.* at 685, 106 S.Ct. 3159.

**25.** *Id.*

pression at the schoolhouse gate.' "[26] It drew a distinction, though, between "personal expression that happens to occur on the school premises," which is fully protected by *Tinker,* and "school-sponsored publications ... and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of· the school."[27] The principal had excluded some stories from the school newspaper, which was not independently prepared outside the school by students, but was prepared under school sponsorship and supervision as part of the journalism curriculum.[28] The Court held that in such a school-sponsored activity, the constitutional test was whether the school's actions regarding content "are reasonably related to legitimate pedagogical concerns."[29] Because James's poem was "personal expression that happens to occur on the school premises," not school sponsored activity, the "reasonably related to legitimate pedagogical concerns" test has no application.

In the absence of any viewpoint discrimination or other disqualifier, perhaps a school could constitutionally punish student personal expression within the school if (1) as in *Tinker, Bethel* and *Hazelwood,* the student had clear notice that the speech was prohibited and would be punished, and (2) "Disturbances or disorders on the school premises in fact occurred"[30] or the record demonstrated "facts which might reasonably have led school authorities to forecast substantial disruption of or

material interference with school activities."[31] I have no doubt that the school could prohibit discussion of poetry in calculus class under such a rule, but am considerably less confident that it could prohibit students from talking to each other during recesses about sex, religion or politics, on the ground that such discussions were likely to lead to hard feelings and disruption. But even under such a rule, James could not be punished, because he did not have notice that his poem would expose him to punishment. At most, the school could, under *Tinker, Bethel,* and *Hazelwood,* tell him not to circulate it any more in school, and then punish him if he did.

The panel opinion suggests that there was nothing else the school could do to exclude James pending psychiatric examination, that it had "only one option," emergency expulsion.[32] That is incorrect, and it would not matter if it were correct. The district judge pointed out that the school could have used "a temporary suspension pending psychiatric examination" to accomplish its legitimate purpose fully. She also pointed out correctly that "the supremacy clause will not allow state legislation to excuse noncompliance with the federal constitution." There can be little doubt that, even if there were not an explicit rule providing for suspensions where students posed risks to others on account of medical conditions, the school had implied authority to exercise the police power for that purpose.[33]

---

26. *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (quoting *Tinker* at 506, 89 S.Ct. 733).

27. *Id.* at 271, 108 S.Ct. 562.

28. *Id.* at 267–70, 108 S.Ct. 562.

29. *Id.* at 273, 108 S.Ct. 562.

30. *Tinker,* 393 U.S. at 514, 89 S.Ct. 733.

31. *Id.*

32. *LaVine,* 257 F.3d at 990.

33. *See State v. Armstrong,* 39 Wash.2d 860, 239 P.2d 545, 548–49 (1952) (university board of regents may refuse admission to student who refuses to get a chest x-ray to rule out

The panel describes this case as arising "against the backdrop of tragic school shootings"[34] and school officials' knowledge of "shootings at Columbine, Thurston, and Santee high schools."[35] Constitutional law ought to be based on neutral principles, and should not easily sway in the winds of popular concerns, for that would make our liberty a weak reed that swayed in the winds. Nevertheless we do not perform our work in isolation from the society we live in, and there is a notion that permeates the record in this case that because of increased violence in the schools, free speech ought to give way to increased security. Both the diagnosis and the cure are probably wrong, and such constitutional law ought not to be based on this vague popular sociology. There may well be, not an increase in school violence, but rather an increase in newspaper, magazine, and television stories about school violence, which has in fact been declining or steady in its frequency.[36] As for the cure, there is no particular reason to think that punishing speech about school violence will reduce the amount of school violence. Though we judges have traditionally explained the value of freedom of speech in terms of the value of having a free marketplace of ideas,[37] those whose profession is psychology and psychiatry rather than law traditionally explain it in terms of what they can learn about a patient if the patient communicates openly. An article in *American Psychologist*[38] explains that (1) rates of criminal victimization in schools have apparently not risen in the past decade;[39] (2) prediction of violent behavior is exceedingly difficult, because "for every killer youth, there are many others with the same behaviors or attitudes who never come close to killing their classmates";[40] (3) "the ratio of false positives to false negatives matters greatly if all identified individuals are stigmatized or if their opportunities are limited";[41] (4) youths who engage in violent behavior "are not usually loners";[42] (5) both diagnosis and interventions for violence-prone ado-

tuberculosis, even without a regulation, under its implied authority). *Cf. Jacobson v. Massachusetts*, 197 U.S. 11, 37–38, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (state may require vaccinations under its police power).

34. *LaVine* at 983.

35. *Id.* at 987.

36. The amicus brief cites for this proposition, Kim Brook, Vincent Schiraldi, and Jason Ziedenberg, *School House Hype: Two Years Later* (Justice Policy Institute and Children's Law Center, April 2000), *available at* http://www.cjcj.org/jpi/publications.html (arguing that schools remain one of the safest places for children to be and that school violence is declining). *See also* Lori Dorfman and Vincent Schiraldi, *Off Balance: Youth, Race, and Crime in the News* (Building Blocks for Youth, April 2001), *available at* http://www .cjcj.org/jpi/publications.html (discussing research showing a correlation between public perception of crime rates and news reporting).

37. *See, e.g., Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ("It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Dennis v. United States*, 341 U.S. 494, 503, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

38. Edward P. Mulvey and Elizabeth Cauffman, *The Inherent Limits of Predicting School Violence*, 56 American Psychologist 797 (2001).

39. *Id.* at 797.

40. *Id.* at 797–98.

41. *Id.* at 798.

42. *Id.*

lescents are not well developed;[43] (6) for risk assessment, "the best source of information about the activities of students in a school is other students";[44] (7) expulsion dries up information, because "students will withhold information from the administration to avoid such disproportionate punishments."[45]

I do not cite this article to suggest that constitutional law ought to be based on this sociological and psychological basis instead of the basis to which the panel gave some deference, that expulsion for speech not amounting to a "true threat" will reduce school violence. My purpose is to show that there is not necessarily any trade-off between speech and security. Suppression of speech may reduce security as well as liberty. Allowing the school to punish a student for writing a poem about a school killer may foster school killings, by drying up information from students about their own and other students' emotional troubles. If the students don't talk, the administrators and medical professionals won't find out about problems that speech might reveal. Punishment based on prediction rather than misconduct tends to be unjust, and where the predicted event is extremely rare, as in-school murders are, predictive punishment such as the school imposed is likely to punish vast numbers of innocent people for every one who would have engaged in the feared misconduct.[46]

What was threatening about James's poem was not the words but the writer. The fact that he wrote the poem, given his background, might have indicated that he was so emotionally distraught that he might hurt himself and others. The fact that James wrote the poem might reasonably have justified a temporary suspension for mental examination, which was done, and which ascertained after three psychiatric visits that he could safely return to school. But the fact that James's poem might have revealed his emotional condition did not constitutionally justify punishing him.

Not everyone who writes about murder and evil is an incipient murderer. There is a lot of art about homicide (*e.g.*, the folk songs "On the Banks of the Ohio"[47] and "Tom Dooley,"[48] Dostoevski's *Crime and Punishment*[49]) and about homicidal maniacs who commit mass murder (*e.g.*, *Taxi Driver*[50]). This art sometimes inspires crime (*e.g.*, John Hinckley shooting President Reagan to impress Jodie Foster's character in *Taxi Driver* ). But the government could not properly punish Robert DeNiro for acting in *Taxi Driver*, nor the

---

**43.**  *Id.* at 799.

**44.**  *Id.* at 800.

**45.**  *Id.*

**46.**  *Cf. Gonzalez v. Metropolitan Transportation Authority*, 174 F.3d 1016, 1023 (9th Cir.1999) (noting that false positives are more likely to outnumber true positives to the extent that what is tested for is rare in the population tested).

**47.**  "I asked my love to take a walk,
Just a little way's with me.
An' as we walked,
Then we would talk
All about our wedding day.

"I took her by her pretty white hand,
I led her down the banks of sand,
I plunged her in
Where she would drown,
An' watched her as she floated down."

**48.**  "I met her on the mountain,
There I took her life.
Met her on the mountain,
Stabbed her with my knife."

**49.**  Fyodor Dostoevsky, *Crime and Punishment* (Constance Garnett, trans., Bantam Classics, reissue edition 1984) (1912).

**50.**  *Taxi Driver* (Columbia/Tristar Studios 1976).

Kingston Trio for performing "Tom Doo-ley," [51] no matter how many people found these artworks disturbing or threatening. We do not, under our constitution, allow the government to punish artists for making art, whether the art is good or bad, whether it makes people feel good or bad, unless the expression falls within a well established category of unprotected speech. This right too does not end at the schoolhouse gate.

## APPENDIX

**Last Words**

by James LaVine

As each day passed,
I watched,
love sprout, from the most,
unlikely places,
wich [52] reminds,
me that,
beauty is in the eye's,
of the beholder.

As I remember,
I start to cry,
for I,
had leared,
this to late,
and now,
I must spend,
each day,
alone,
alone for supper,
alone at night,
alone at death.

Death I feel,
crawlling down,
my neck at,
every turn,
and so,
now I know,
what I must do.

I pulled my gun,
from its case,
and began to load it.

I remember,
thinking at least I won't,
go alone,
as I,
jumped in,
the car,
all I could think about,
was I would not,
go alone.

As I walked,
through the,
now empty halls,
I could feel,
my hart pounding.

As I approached,
the classroom door,
I drew my gun and,
threw open the door,
**Bang, Bang, Bang, Bang.**

When it was all over,
28 were,
dead, and all I remember,
was not felling,
any remorce,
for I felt,
I was,
clensing my soul,

I quickly,
turned and ran,
as the bell rang,
all I could here,
were screams,
screams of co workers,
and just plan,
screams of shear horror,
as the students,
found their,
slayen classmates.

2 years have passed,
and now I lay,
29   roses,
down upon,
these stairs,
as now,
I feel,
I may,
strike again.

No tears,
shall be shead,

---

**51.** The Kingston Trio, "Tom Dooley" *on Tom Dooley* (EMI/Capitol Special Products 1994).

**52.** All typographical errors are James La-vine's.

in sarrow,
for I am,
alone,
and now,
I hope,
I can feel,
remorse,
for what I did,
without a shed,
of tears,
for no tear,
shall fall, from your face,
but from mine,
as I try,
to rest in peace,

**Bang!**